Edward BOLGER, Plaintiff,

v.

UNITED STATES of America, Robert G. Anderson, Secretary of the Treasury of the United States of America, Customs Agents William J. O'Shea and Thomas F. Loughman, Customs Enforcement Officers Walter J. Conlon and Joseph E. Patterson and Dorothy T. Zecha, Shorthand Reporter, in charge of office of Supervising Agent of Customs, Port of New York and Michael Cleary, Defendants.

Edward BOLGER, Plaintiff,

v.

WATERFRONT COMMISSION OF NEW YORK HARBOR and David C. Thompson, Commissioner, and James O'Malley, Jr., Commissioner, Defendants.

United States District Court
S. D. New York.

Nov. 15, 1960.

Joseph Aronstein, New York City, for plaintiff.

S. Hazard Gillespie, Jr., U. S. Atty., for the Southern District of New York, New York City, for defendants, United States. Robert G. Anderson, William J. O'Shea, Thomas F. Loughman, Walter J. Conlon, Joseph E. Patterson and Dorothy T. Zecha, Arthur V. Savage, Asst. U. S. Atty., New York City, of counsel.

William P. Sirignano, Gen. Counsel for Waterfront Commission of New York Harbor, New York City, Irving J. Malchman, New York City, of counsel.

FREDERICK van PELT BRYAN, District Judge.

Edward Bolger, the plaintiff in these two actions, is a hiring agent and longshoreman licensed by the Waterfront Commission of New York Harbor and employed on the New York waterfront.

Bolger claims that on September 12, 1959 he was arrested in the early morning by federal customs agents without a warrant and held until the evening of that day without being arraigned or even charged; that during the day his home was searched and property found there seized without warrant, and incriminating statements were extracted from him while he was under detention. He contends that the arrest, search and seizure and detention were all unlawful and in violation of his rights under the Fourth and Fifth Amendments of the Constitution and under Rules 4, 5(a) and 41 of the Federal Rules of Criminal Procedure, 18 U.S.C.

In the first action, Civil No. 153–182, the defendants O'Shea and Loughman are Customs agents, and Conlon and Patterson are Customs enforcement officers who were concerned in the detention and questioning of Bolger and the search and seizure. Defendant Zecha is a Customs Service shorthand reporter who took down and transcribed an incriminating statement made by Bolger during his detention. Defendant Cleary is a Waterfront Commission detective who was present when Bolger's statement was taken and at other times during his detention.

Bolger had originally named as defendants in the first action the United States and the Secretary of the Treasury. The action has been dismissed as to these defendants.

Bolger seeks an injunction restraining each of the remaining defendants from testifying, as to any evidence obtained or statements made during his detention or secured by the search and seizure, in criminal proceedings against him now pending in the Court of Special Sessions of the City of New York, or in proceedings before the Waterfront Commission for the revocation of his longshoreman's and hiring agent's licenses. He also seeks the return of all property seized.

In the second action, Civil 60–1184, the defendants are the members of the Waterfront Commission of New York Harbor, a bi-state agency of the States of New York and New Jersey. Bolger seeks to restrain the Commission and its members from considering any evidence obtained in the course of the detention and

search, in the proceedings before it relating to his licenses.

Bolger brought on a motion before me for a preliminary injunction in his first action. I directed that a hearing be held before me on the facts. After that hearing had started Bolger commenced his second action against the Waterfront Commission. During the course of the hearing all parties stipulated that the hearing should be considered a final trial on the merits in both actions. The trial has been concluded and both actions are now ripe for final decision.

## I. The facts

The facts as developed at the trial and as I find them to be are as follows:

In September 1959 Bolger was employed by the Cosmopolitan Line as an assistant boss of stevedores mainly acting as foreman during the loading and unloading of ships at various piers along the New York shore of the North River. He had been employed on the waterfront for 35 years. He is 54 years old, married, and lives in Keansburg, New Jersey, about an hour's drive from New York. He has had no previous trouble with the law.

September 12, 1959 was a Saturday. At about 8:00 in the morning, Bolger entered Pier 56, North River, at 14th Street, one of the piers on which he regularly worked. The pier was not being worked on that day.

Federal customs enforcement officers, Patterson and Conlon, were in a parked car about 200 yards distant. They were on the lookout for thefts from the piers and particularly thefts of liquor which had been occurring frequently. They observed Bolger enter the deserted pier, carry a cardboard carton from it and place the carton in a car parked at the pier entrance. He then was observed to move some pallets about the pier with a fork lift truck. About half an hour after he had entered the pier he got in his car and drove south. The customs officers followed in their car.

At Pier 46, North River, four blocks south, Patterson displayed his badge and ordered Bolger to pull over to the side and stop. Bolger complied and the officers parked their car in front of his. The officers ordered him out of his car and "frisked" him. It was then shortly after 8:30 a. m.

Conlon asked Bolger to show him the carton which he had carried from the pier. Bolger did so. It contained only empty soda bottles. Conlon examined several other cartons in the back of the car. They contained more empty soda bottles. He then ordered Bolger to open the trunk. Again there were only empty soda bottles. Bolger was questioned about whether he had obtained any liquor from the piers. He replied that he had six or eight bottles at home which he had bought from crew members who had bought the liquor from ships' stores.

When Conlon had completed the search of the back of the car and the trunk, Patterson searched the front of the car. In the glove compartment, he found a number of spark plugs and windshield wipers. Two of the windshield wipers and six of the spark plugs were stamped "Made in England". They could have been bought here for about seven dollars.

In view of Bolger's statements about the possession of liquor obtained from crew members and the two windshield wipers and six spark plugs found in his car stamped "Made in England", the Customs officers decided to take Bolger in custody. By then it was close to 9 o'clock.

Bolger and Patterson got into Bolger's car and followed Conlon's car south. Both parked in front of Pier 42. Conlon went inside to call his superiors, Customs agents O'Shea and Loughman. Patterson took Bolger's car keys, told Bolger to remain in the car, and followed Conlon inside. When he came out a few minutes later Bolger asked to telephone. Patterson refused but said he would be permitted to call later.

Patterson and Bolger then followed Conlon in Bolger's car to 54 Stone Street, headquarters of the Customs Enforcement Section, arriving there about half past nine. Bolger again asked Patter-

son to use the telephone and was again refused.

At 10 a. m. customs agents Loughman and O'Shea arrived at 54 Stone Street. At about 10:30, after some preliminary questions Bolger was taken into a separate room by O'Shea. He admitted that he had some thirty or forty bottles of liquor obtained from seamen, and additional merchandise, at his home in Keansburg. Later in the interrogation Bolger signed a so-called consent to search which read as follows:

"I, Edward Joseph Bolger, hereby authorize W. J. O'Shea and ——— Customs Agents of the Customs Agency Service, U. S. Treasury Department, to conduct a complete search of my residence located at 80 Willis Ave. Keansburg, N. J. These agents are authorized by me to take from my residence any letters, papers, materials, or other property which they may desire.

"This written permission is being given by me to the above agents voluntarily and without threats or promises of any kind."

It was signed by Bolger and witnessed by O'Shea. The agents rely on this document to justify the search of Bolger's house and the seizure of property found there.

The testimony is in conflict as to the circumstances under which Bolger signed the consent.

After considering the conflicting testimony and evaluating the credibility of the witnesses, I find that Bolger refused to sign the consent to search without consulting a lawyer. The agents told him in substance that, considering the information they had already obtained, the consent form was unnecessary and they could search without it but that he might as well sign it to save them trouble. Bolger then signed the form.

Bolger had previously asked Loughman how his present difficulties would affect his longshoreman's and hiring agent's licenses issued by the Waterfront Commission. Loughman told Bolger that he had nothing to do with Waterfront Commission and could promise him nothing but that when the Waterfront Commission examined Bolger's case they would probably take his cooperation with the Customs Service into account.

Shortly before 11 a. m. Patterson, Conlon, O'Shea and Bolger left 54 Stone Street in a government car for Bolger's house in Keansburg, New Jersey. They arrived about noon. Bolger's wife was there with two guests and their children who were spending the weekend. Bolger briefly explained to his wife why the agents were there. Then, at O'Shea's direction he led O'Shea to a bedroom closet where there were some seventy-five bottles of liquor. O'Shea then searched other parts of the house. During most of the search Bolger remained in the dining room with one of the other agents and Mrs. Bolger accompanied O'Shea. O'Shea removed various other items, including perfumes, gloves, handkerchiefs, linens, porcelain figurines, cloth and costume jewelry. In Mrs. Bolger's bedroom closet he found a Stenorette tape recording machine made in West Germany.

Bolger was asked if he wanted to have some lunch but said he did not. Bolger, Patterson, Conlon and O'Shea left for New York at about 2 p. m., the search having taken some two hours. They took with them all the articles which they had found in Bolger's house which they suspected were acquired illegally.

On the way back to New York they stopped for lunch. Bolger was offered food but had only a bottle of soda. This was all he had from the time he was first detained at 8:30 a. m. until he was released at 7:30 p. m. that night.

The group arrived back in New York about 4 p. m. and went directly to 201 Varick Street, headquarters of the Customs Service.

The Waterfront Commission, which worked in close cooperation with the Customs Service, had been informed of Bolger's detention.

About ten minutes after Bolger arrived at Varick Street he was questioned

briefly by Machry, a Waterfront Commission detective, and was asked to show his hiring agent's and longshoreman's licenses.

Loughman, and Cleary, another Waterfront detective, were standing nearby. They asked Bolger to produce his key ring. Bolger told them that one of the keys was to a tool room in the basement of an apartment house on 75th Street and West End Avenue which he occasionally used to repair pier equipment. Loughman and Cleary decided to investigate this story. They drove Bolger to the basement tool room in a Waterfront Commission car, ordered Bolger to open the room and searched it. Finding nothing suspicious they returned to Varick Street with Bolger about 5:45 p. m. A few minutes later he was asked if he was willing to make a statement concerning the merchandise seized from his home. Apparently he did not demur.

After telling him that he did not have to make a statement and that anything said could be used against him, he was sworn, and Loughman and O'Shea proceeded to question him. Mrs. Zecha, a Customs Service reporter, took down the questions and answers verbatim. Cleary, the Waterfront Commission detective, was present throughout the questioning and could have participated though he did not do so.

Bolger admitted that with the exception of a few items which he had bought from crew members he had found most of the merchandise taken from his house on piers where he was working and had removed it. He also said that he had found the Stenorette tape recorder "bunked" on a lighter moored at one of the piers.

At the conclusion Bolger was asked whether he had voluntarily granted permission to search his house and whether the statement was made voluntarily without "duress, threats or other form of intimidation or promise of reward". He replied that it was. The statement was transcribed but was never shown to Bolger and was unsigned.

The questioning concluded about 7 p. m. Bolger was permitted to leave at 7:20. One of the customs officers drove him back to 54 Stone Street where his car was parked and he drove off about 7:30.

Before he left he was warned to keep himself available for further questioning. However, he was not questioned further and no charges were ever lodged against him by the federal authorities.

Although a United States Commissioner was sitting in the United States Court House, a short distance away, from 11 a. m. to 1 p. m. on that day, no effort was made to bring Bolger before the commissioner, or before any of the judges of the court who might have been available. Nor was there any attempt to obtain a search warrant. At no time was counsel available to Bolger, despite the fact that he had indicated he wanted to consult counsel before signing the "consent" to search and, at least twice, was refused the use of a telephone. At no time was he advised of his right to arraignment, to a hearing before a commissioner, or to consult counsel.

A month later Bolger was arrested by the New York City police upon a charge of grand larceny for the theft of the Stenorette tape recorder which was among the articles seized by the customs officers at his house on September 12. This charge, now reduced to petty larceny, is scheduled for trial in the Court of Special Sessions of the City of New York. As the result of this charge the Waterfront Commission subsequently suspended temporarily Bolger's licenses as hiring agent and longshoreman. Hearings on the revocation of these licenses have been deferred until after the disposition of the larceny charge in the Court of Special Sessions. The trial in Special Sessions has been deferred pending decision of the present actions.

II. The first action (Civil No. 153–182)
a. Jurisdiction

The question of jurisdiction lies at the threshold of Bolger's action against the agents of the federal Customs Service

and the Waterfront Commission detective Cleary. All the defendants contend that this court has no jurisdiction of the subject matter of the action. The considerations affecting Cleary, who is employed by the Waterfront Commission will be discussed separately.

Plaintiff asserts that jurisdiction rests on Rea v. United States, 350 U.S. 214, 76 S.Ct. 292, 100 L.Ed. 233. There a federal agent had seized marijuana under a search warrant issued by a United States commissioner as authorized by Rule 41 (a) of the Federal Rules of Criminal Procedure. The warrant was improperly issued under Rule 41(c) since it was insufficient on its face, no probable cause existed, and the affidavit was based on unsworn statements. Petitioner was indicted by a federal grand jury for unlawful acquisition of marijuana. The district court granted a motion to suppress the evidence as to the seized marijuana on the ground that it was obtained by an unlawful search and seizure and the federal indictment was later dismissed on the Government's motion. The marijuana seized was contraband and no motion was made for its return.

Thereafter the federal narcotics agent swore to a complaint in the New Mexico State Court charging petitioner with illegal possession of marijuana in violation of state law. He was arrested on that charge and awaited trial in the state court. The case against him would have been made by testimony of the federal agent based on the unlawful search and seizure.

Petitioner brought a proceeding in the district court to enjoin the federal narcotics agent from testifying in the state court as to the narcotics obtained in the unlawful search. His application for such relief was denied by the district court and the Court of Appeals affirmed. 10 Cir., 218 F.2d 237.

The Supreme Court held, five to four, that the motion to enjoin should have been granted. Mr. Justice Douglas, writing for the majority, said that the case did not raise constitutional questions but concerned "our supervisory powers over federal law enforcement agencies" which the federal courts should exercise to prevent violations by federal agents of the Federal Rules of Criminal Procedure governing searches and seizures. He went on to say (350 U.S. at page 217, 76 S.Ct. at page 294):

"No injunction is sought against a state official. The only remedy asked is against a federal agent who, we are told, plans to use his illegal search and seizure as the basis of testimony in the state court. To enjoin the federal agent from testifying is merely to enforce the federal Rules against those owing obedience to them."

Defendants, on the other hand, urge that the later case of Wilson v. Schnettler, 7 Cir., 275 F.2d 932, 934, certiorari granted 363 U.S. 840, 80 S.Ct. 1629, 4 L.Ed.2d 1725, controls and that under it the district court has no jurisdiction over this action and may not grant the relief sought.

In the Wilson case petitioner had been arrested and searched without a warrant by federal narcotics agents who had seized narcotics found on his person. No federal warrant had been applied for and there was no indictment or charge against the defendant in the federal courts. He was indicted by a state grand jury and charged with unlawful possession of narcotic drugs. He brought on a motion in the state court before which his case was pending for suppression of the evidence obtained by the allegedly unlawful search and seizure, which was denied.

Petitioner then brought a proceeding in the federal district court against the federal narcotics agents based on the Rea case, seeking judgment declaring that his arrest and search without a warrant was in violation of his rights under the Constitution and the Federal Rules of Criminal Procedure. He also sought to impound the seized narcotics, and to enjoin the agents from testifying with respect to such evidence in the pending criminal proceedings in the state court.

The Court of Appeals of the Seventh Circuit found that the case "squarely raises the question asked by the dissenting minority in Rea [per Mr. Justice Harlan]: 'Would the Court's decision have been different had there been no search warrant at all?'" [275 F.2d at page 934.] It reached the conclusion that the decision would have been different.

It reasoned that in the absence of a federal warrant and a charge against the defendant in the federal courts, the federal courts had no power to restrain a federal agent from testifying in a state criminal proceeding. The court held that "the criticized activities of these officers were not and have never been brought within the effective sphere of federal judicial supervision", (supra at page 935 of 275 F.2d), and that to enjoin the federal agents from testifying in a state proceeding with respect to evidence obtained by them through unlawful search and seizure would be an unwarranted interference with state administration of criminal justice not authorized by the Rea case.

The leading case on non-interference by the federal courts in state criminal proceedings is Stefannelli v. Minard, 342 U.S. 117, 72 S.Ct. 118, 96 L.Ed. 138.

There the Supreme Court, per Mr. Justice Frankfurter, held that federal courts should refuse to enjoin the use in a state criminal trial of evidence obtained by state officers through unlawful search and seizure. Mr. Justice Frankfurter emphasized that the delicate balance between the states and the federal government in the enforcement of the criminal law required that such relief against state officers should be denied as a matter of discretion even if the district court had power to grant it, in view of the dangers of exposing "every State criminal prosecution to insupportable disruption". Supra, 342 U.S. at page 123, 72 S.Ct. at page 122.

The latest application of the Stefannelli v. Minard doctrine, was in Pugach v. Dollinger, 2 Cir., 277 F.2d 739, certiorari granted 363 U.S. 836, 80 S.Ct. 1614, 4 L.Ed.2d 1723, where the Court of Appeals of this circuit, relying on the Stefannelli case, upheld my refusal below to enjoin the use of wiretap evidence in a state prosecution which was obtained by state officers in violation of Section 605 of the Communications Act of 1934, 47 U.S.C.A. § 605.

I am deeply sensitive of the necessity for preserving the delicate balance between the states and the federal government in this area and of leaving to the states the enforcement of state criminal law without intervention by the federal courts. See my opinion below in Pugach v. Sullivan, D.C.S.D.N.Y., 180 F.Supp. 66, and cases there cited. I am also well aware of the difficulties and dangers which would result from such intervention which were so cogently pointed out by Mr. Justice Frankfurter in the Stefannelli case.

The distinctions between the case at bar and the Rea case are much the same as those relied on in Wilson v. Schnettler. In both the case at bar and in the Wilson case, as distinguished from the Rea case, no federal warrant had been issued or even sought, no federal criminal proceeding had ever been brought, and no federal charge had ever been laid against the petitioner. If the reasoning of Wilson v. Schnettler were valid it would have to be concluded that the Rea case does not authorize the proceeding at bar and that the district court should refuse to grant the relief sought to avoid undue interference with the state administration of criminal justice.

I do not agree with the reasoning of Wilson v. Schnettler and I do not follow it.

In the first place I do not see that the case at bar involves undue interference with state administration of justice under Stefannelli v. Minard. The court in the Rea case expressly stated that its decision did not run counter to its Stefannelli decision. The opinion pointed out that the district court was "not asked to enjoin state officials nor in any way to interfere with the state agencies in enforcement of state law." The only ques-

tion was as to the exercise of the supervisory powers of the district courts over federal law enforcement agencies.

Such powers were to be used to police the requirements of the Federal Rules of Criminal Procedure to make "certain that they are observed". The Rea case teaches that the federal courts have the obligation to exercise such power so as "to enforce the federal Rules against those owing obedience to them".

■ While the Federal Rules of Criminal Procedure are primarily designed to "govern the procedure in the courts of the United States and before United States commissioners in all criminal proceedings" (Rule 1), this is not their only function. The Rea opinion says in so many words that the rules "prescribe standards for law enforcement" and "are designed to protect the privacy of the citizen, unless the strict standards set for searches and seizures be satisfied". "The obligation of the federal agent is to obey the Rules," and "they are designed as standards for federal agents."

The question asked by Mr. Justice Harlan in his dissent in the Rea case as to whether the decision would have been different had there been no warrant at all, seems to me to have been rhetorical and to have assumed a negative answer. I disagree with the view of Wilson v. Schnettler that the answer would have been in the affirmative.

■ Given the premises of the Rea case, it does not seem to me of any controlling significance whether the federal agents conducted an unlawful search and made an unlawful seizure under a defective warrant issued by a United States Commissioner, or under no warrant at all. In either case they would be acting in violation of the rules governing searches and seizures. In either case they would be acting contrary to their obligation to obey such rules. In either case the federal courts would have both the power and the obligation to police the rules and to make certain they are obeyed. In either case to restrain a federal agent from testifying in a state court as to

evidence so unlawfully obtained would be "merely to enforce the federal Rules against those owing obedience to them".

It would be an anomaly to hold that equitable relief should be granted where federal agents had made at least an attempt to obey the rules though they had secured an invalid process and that relief should be denied where the agents had flouted the rules by making no attempt to obtain a warrant at all. Such a result would leave federal agents free to act as they pleased in violation of the rights of citizens by totally ignoring their obligations to obey the rules. It would place a premium on the flouting of the rules by federal agents which is specifically condemned in the Rea case.

It was anomalies of this nature which recently led the Supreme Court to re-examine the validity of the so-called "silver platter" doctrine in Elkins v. United States, 364 U.S. 206, 80 S.Ct. 1437, 1453, 4 L.Ed.2d 1669, 1688. Upon such re-examination it held that evidence obtained as a result of an unreasonable search and seizure by state officers, without any involvement of federal officers, was no longer admissible in the federal courts despite long-standing precedents to the contrary. As the court said (364 U.S. at pages 221–222, 80 S.Ct. at page 1446):

> "Free and open cooperation between state and federal law enforcement officers is to be commended and encouraged. Yet that kind of cooperation is hardly promoted by a rule that implicitly invites federal officers to withdraw from such association and at least tacitly to encourage state officers in the disregard of constitutionally protected freedom. If, on the other hand, it is understood that the fruit of an unlawful search by state agents will be inadmissible in a federal trial, there can be no inducement to subterfuge and evasion with respect to federal-state cooperation in criminal investigation. Instead, forthright cooperation under constitutional standards will be promoted and fostered."

If the grant or denial of relief under the Rea case depended on whether the federal agents at least attempted to obey the rules by obtaining a warrant even though invalid, or flouted them entirely by obtaining no warrant at all, there would be every "inducement to subterfuge and evasion with respect to federal-state cooperation in criminal investigation" (364 U.S. at page 222, 80 S.Ct. at page 1446). There would be an implicit invitation to federal officers, acting in association with state officers, to violate both the federal rules and constitutional guarantees. They would be encouraged to bypass the federal courts entirely in cases where the only evidence was that which could be obtained unlawfully and to turn such evidence obtained in violation of the federal rules directly over to state law enforcement authorities and thus use the fruits of their unlawful acts.

Nor do I find anything in the Rea case which holds that relief was dependent on the commencement or pendency of a criminal proceeding in the federal courts. In fact, when the motion in the Rea case was made the criminal proceedings against the petitioner had been dismissed on motion of the government and no proceedings of any kind were pending before the district court.

The concept that the district courts have inherent power to enforce the longstanding practices embodied in the federal rules, in the absence of any criminal or other proceedings before the court, is not startling or novel. In Grant v. United States, 2 Cir., 282 F.2d 165, 168, Judge Friendly recently had occasion to discuss the nature of a motion made under Rule 41(e) for the suppression and return of evidence unlawfully seized which was made before any criminal proceedings had been commenced or any application had been made to the district court by the government. In the course of his opinion Judge Friendly said:

"We have said that such a motion 'was in effect a complaint initiating a civil action,' Lapides v. United States, 2 Cir., 1954, 215 F.2d 253, 254; Russo v. United States, 2 Cir., 241 F.2d 285, 287, certiorari denied 1957, 355 U.S. 816, 78 S.Ct. 18, 2 L.Ed.2d 33, and so it is in the sense with which the Court was there mainly concerned, namely, its independence from the later criminal proceeding and the consequent appealability of a final order therein under 28 U.S.C. § 1291. However, the jurisdictional grants in 28 U.S.C. §§ 1331–1358 will be searched in vain for any rubric under which such a motion falls, in the absence of any allegation of jurisdictional amount that would bring it under § 1331, see Centracchio v. Garrity, 1 Cir., 1952, 198 F.2d 382, 385, certiorari denied, 1952, 344 U.S. 866, 73 S.Ct. 108, 97 L.Ed. 672."

Judge Friendly went on to say, citing Judge Hough in United States v. Maresca, D.C.S.D.N.Y., 266 F. 713, 717, that jurisdiction over such a proceeding derives from " 'the inherent disciplinary power of any court' " over its own officers.

■■ As the Rea case makes clear, the right to relief against violation of the rules by federal agents, like the right to relief discussed in the Grant case, derives from inherent powers of the court. It is not dependent upon whether or not a criminal proceeding against the petitioner is pending.[1]

---

1. It may be noted that in 1957, subsequent to Rea v. United States and to Centracchio v. Garrity cited by Judge Friendly in the Grant case, Congress added a new subdivision 4 to Section 1343 of the Judicial Code, 28 U.S.C. § 1343, which conferred original jurisdiction on the district courts over any civil action authorized by law to be commenced by any person.

"(4) to recover damages or to secure equitable or other relief under any act of Congress providing for the protection of civil rights, including the right to vote".

There is no doubt that the Federal Rules of Criminal Procedure, in so far as they relate to searches and seizures and to the necessity for bringing an arrested person before a commissioner without unreasonable delay, may be con-

■ Thus I conclude that under Rea v. United States I have power to grant the relief sought and that if the record before me establishes that evidence was obtained by the defendant federal agents through an unlawful search and seizure, I have the obligation to restrain the agents from producing such evidence or testifying with respect to it in the state courts.

Thus far the discussion has centered about the evidence claimed to have been obtained by unlawful search and seizure. In addition, however, Bolger claims that he was unlawfully detained by the federal agents in violation of Rule 5(a) of the Federal Rules of Criminal Procedure, and that during such detention highly incriminating statements were obtained from him. He also seeks to enjoin the federal agents from producing such statements or from testifying about them in the state proceedings.

Rule 5(a) of the Federal Rules of Criminal Procedure provides:

> "An officer making an arrest under a warrant issued upon a complaint or any person making an arrest without a warrant shall take the arrested person without unnecessary delay before the nearest available commissioner or before any other nearby officer empowered to commit persons charged with offenses against the laws of the United States. When a person arrested without a warrant is brought before a commissioner or other officer, a complaint shall be filed forthwith."

■ Under the familiar McNabb-Mallory rule unreasonable delay in bringing a person before a commissioner is a violation of Rule 5(a), and constitutes a wilful disobedience of law by the offending officers. Incriminating statements obtained from defendants during the period of such unlawful detention are inadmissible in federal criminal proceedings. Mallory v. United States, 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed.2d 1479; McNabb v. United States, 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819.

■ Like Rule 41 dealing with searches and seizures, Rule 5(a) is a rule which federal agents are bound to obey, as the Mallory and McNabb cases make clear. If this rule is violated by federal agents the doctrine of the Rea case comes into play and the same principles govern as apply to evidence obtained by unlawful search and seizure in violation of Rule 41. Thus this court has the obligation to restrain federal agents from producing or testifying in state proceedings as to evidence obtained in violation of Rule 5 (a), as well as of Rule 41.

b. The violations of the Federal Rules

We thus come to the question of whether the evidence before me establishes that the federal agents violated the Federal Rules of Criminal Procedure, and, if so, in what respects. Plaintiff complains (1) that Rule 4 was violated by his initial detention and arrest without warrant; (2) that Rule 41(a) was violated when his home in Keansburg, New Jersey, was searched without a warrant and property there seized; and (3) that Rule 5(a) was violated when the agents failed to bring him before a United States Commissioner without unnecessary delay and held him for an unreasonable length of time, without arraignment, during which time incriminating statements were extracted from him.

As in most cases where such claims are made resolution of the questions presented requires a careful evaluation of the conduct of the officers involved. See Go-Bart Importing Co. v. United States, 282 U.S. 344, 51 S.Ct. 153, 75 L.Ed. 374;

---

sidered as acts of Congress providing for the protection of civil rights. See Iovino v. Waterson, 2 Cir., 274 F.2d 41; Rea v. United States, supra. If any statutory authority is needed to confer on the district courts jurisdiction over actions to enforce the substantive rights

held to exist in Rea, it may well be found in the new subdivision 4. Cf. generally, Douglas v. City of Jeannette, 319 U.S. 157, 63 S.Ct. 877, 87 L.Ed. 1324; Hague v. C. I. O., 307 U.S. 496, 59 S.Ct. 954, 83 L.Ed. 1423.

Rios v. United States, 364 U.S. 253, 80 S.Ct. 1431, 4 L.Ed.2d 1688.

### 1. The initial detention and arrest

When Customs enforcement officers Patterson and Conlon observed Bolger leaving deserted pier 56 in the early morning of September 12, 1959 he was carrying a carton which he placed in his car parked nearby. The officers had information that liquor was being unlawfully removed from the piers and were on the lookout for such violations of law.

Under the Tariff Act of 1930, 19 U.S.C.A. §§ 482, 1581, customs officers are entitled to conduct searches of very broad character for merchandise introduced into the United States contrary to law. Under Section 482 they may "stop, search, and examine, * * * any vehicle, beast, or person, on which or whom he or they shall suspect there is merchandise which is subject to duty, or shall have been introduced into the United States in any manner contrary to law, * * *." Section 1581 gives them authority to examine, inspect and search any vessel or vehicle and any person, package or cargo on board and they may hail and stop such vessel or vehicle and use all necessary force to compel compliance.

 The officers had reason to suspect that Bolger was unlawfully removing liquor from Pier 56 and taking it away in his car. Neither warrant nor arrest was needed to conduct a search of his automobile in these circumstances.

Such a search is not unreasonable nor does it violate constitutional standards.[2] See Landau v. United States Attorney, 2 Cir., 82 F.2d 285, certiorari denied 298 U.S. 665, 56 S.Ct. 747, 80 L.Ed. 1389; United States v. Yee Ngee How, D.C.N.D. Cal., 105 F.Supp. 517; Boyd v. United States, 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746.

 While the search of the car did not turn up any liquor, Bolger admitted to the officers that he had at his house six or eight bottles of liquor from ships' stores acquired from crew members. Such acquisition of liquor is in violation of Customs regulations and is illegal. 19 C.F.R. § 23.4; 18 U.S.C. § 545.[3] Bolger's admission that he possessed liquor illegally acquired gave the officers probable cause to believe that he had committed a crime and justified their arresting him, see Rios v. United States, 364 U.S. 253, 80 S.Ct. 1431, 4 L.Ed.2d 1688.

 There is no doubt that they did so despite their insistence that they had merely "detained" him. The officers admitted that had Bolger attempted to leave they would have forcibly detained him. Arrest is not a question of semantics and this was an arrest no matter what the officers chose to call it.[4]

The arrest took place shortly after 9 a. m., immediately after the search of Bolger's car had been completed.

### 2. The subsequent detention

When the officers arrested Bolger they were commanded by Rule 5(a), F.R.Cr.

---

2. I do not pass on the question of whether the initial stopping and search of the car would have been justified in the absence of the Customs enforcement statutes. Cf. Henry v. United States, 361 U.S. 98, 80 S.Ct. 168, 172, 4 L.Ed.2d 134, suggesting that such a search might be justified if agents observed that suspicious "packages had been taken from a terminal or from an interstate trucking platform"; Rios v. United States, 364 U.S. 253, 80 S.Ct. 1431, 1436, 4 L.Ed.2d 1688, suggesting that a car may be stopped for the legitimate "purpose of routine interrogation" and with no intent to detain the occupant "beyond the momentary requirements of such a mission" (364 U.S. at page 262, 80 S.Ct. at

page 1436), and that if as a result the suspect revealed facts constituting reasonable cause for arrest, he might then be lawfully arrested.

3. Liquor bought by seamen from ship's stores cannot be transferred and is solely for the seaman's bona fide personal use. 19 C.F.R. § 23.4.

4. See Worden v. Davis, 195 N.Y. 391, 88 N.E. 745, 22 L.R.A.,N.S., 1196; Stevens v. O'Neill, 51 App.Div. 364, 64 N.Y.S. 663, affirmed 169 N.Y. 375, 62 N.E. 424. New York law is applicable under the rule of United States v. Di Re, 332 U.S. 581, 68 S.Ct. 222, 92 L.Ed. 210. See, also, United States v. Perez, 2 Cir., 242 F.2d 867.

P., to bring him before a Commissioner without unnecessary delay so that he could be arraigned, informed of his rights, consult with counsel, have a hearing and be admitted to bail. Rule 5(b). They took him to the headquarters of the Customs Enforcement Service and kept him there from about 9:30 a. m. until shortly before 11 a. m., when they started for his house at Keansburg to make the search. In the interim they questioned him, obtained further admissions about merchandise in his house, and induced him to sign a form purportedly giving his consent to a search of his house. Up to that time no one had advised him of his rights, he had been refused the use of a telephone, and he had had no opportunity to communicate with his friends or relatives, or with counsel. Keansburg was an hour's drive away and it took at least two hours to get there and back, quite apart from the time necessary for a search.

On this Saturday morning a United States Commissioner before whom Bolger could have been brought, was present at the United States Court House only a few blocks away from 11 a. m. to 1 p. m. In any event, the federal court house was open and there is always a judge sitting ex parte available on Saturday morning before whom Bolger could have been arraigned had no commissioner been available. In all probability other federal judges would have been available throughout the day.

However, no attempt whatsoever was made to arraign Bolger as the rules required. Instead he was whisked off on a trip to New Jersey 30 miles away. When the agents started on this expedition with Bolger shortly before eleven it was plain that they had no intention of arraigning him "without unnecessary delay". There was nothing voluntary about Bolger's stay in enforcement headquarters nor about his trip to New Jersey with the officers. He was told what to do and where to go and he did what he was told. He could not have been expected to do anything else under the circumstances.

While his detention at Stone Street up to 11 o'clock, when the commissioner became available at the court house, may have been justifiable, it is plain that his detention without arraignment was not justified thereafter. Instead of starting on the trip to New Jersey, which was bound to take several hours, Bolger should have been taken before the commissioner and the procedure for the protection of his rights prescribed by Rule 5 set in motion.

 I find that Bolger's detention after the commencement of the trip to New Jersey shortly before 11 o'clock in the morning of September 12, 1959 constituted unreasonable delay in bringing him before a commissioner in violation of Rule 5(a) and that such unreasonable delay continued until he was released at 7:30 p. m., some 8½ hours later, without any charges whatsoever having been made against him.

3. The search and seizure

 As I said in United States v. Martin, D.C.S.D.N.Y., 176 F.Supp. 262, at pages 266–267:

"Consent to a search may constitute a waiver of the rights secured by the Fourth Amendment. See United States v. Dornblut, 2 Cir., 261 F.2d 949; United States v. Gross, D.C.S.D.N.Y., 137 F.Supp. 244; United States v. Reckis, D.C.D. Mass., 119 F.Supp. 687. Cf. United States v. Sclafani, 2 Cir., 1959, 265 F.2d 408. However, in order for consent to constitute a waiver the burden is on the United States to show by clear and convincing evidence that it is unequivocal and specific and freely and intelligently given. United States v. Reckis, supra; United States v. Wallace, D.C. D.C., 160 F.Supp. 859. It must be affirmatively shown that there was no duress or coercion, actual or implied. ' "Invitations" to enter one's house, extended to armed officers of the law who demand entrance are usually to be considered as invitations secured by force.' Judd v.

United States, 89 U.S.App.D.C. 64, 190 F.2d 649, 651; United States v. Gross, supra; United States v. Minor, D.C.E.D.Okl., 117 F.Supp. 697.

"Mindful of this * * * ' "courts indulge every reasonable presumption against waiver" of fundamental constitutional rights' (Johnson v. Zerbst, 304 U.S. 458, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461) * * *."

 The defendants here had the burden of showing by clear and convincing evidence that a consent to search "was unequivocal and specific and freely and intelligently given". I find that the defendants have failed to sustain this burden.

Bolger, already twice denied the right to telephone, and cut off from access to relatives or counsel in enforcement headquarters, had been talked to by four agents by the time he signed the consent. He had made serious admissions. He testified that he was confused and apprehensive and I believe him. He was also worried about possible repercussions which might affect his Waterfront Commission licenses under which he earned his livelihood, and had discussed such possibilities with O'Shea.

He refused to sign the consent without consulting a lawyer. He was then induced to do so on the representation by the agents that they had the right to search anyway and, by implication at least, that a lawyer would avail him nothing. This was plainly not true. If properly advised he would have known that there was no right to search without a warrant.

The consent to search and seizure without a warrant was not "unequivocal" nor was it freely and intelligently given. It did not constitute a valid waiver of Bolger's rights.

 It is not necessary to have force or threat to vitiate a consent to search. Consent to search is not valid when based on misrepresentations made by government agents. Gouled v. United States, 255 U.S. 298, 41 S.Ct. 261, 65 L. Ed. 647.

 I hold that the consent form which Bolger was induced to sign without benefit of counsel was void and of no effect and did not authorize the agents to search his home in New Jersey. The search conducted without a warrant, easily obtainable had the agents followed the mandate of Rule 41(a), and the seizures which resulted from the search were unlawful and in violation of Bolger's rights. Johnson v. United States, 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436; Amos v. United States, 255 U.S. 313, 41 S.Ct. 266, 65 L.Ed. 654; United States v. Arrington, 7 Cir., 215 F.2d 630; United ed States v. Minor, D.C.E.D.Okl., 117 F. Supp. 697.

The later conduct of Bolger cannot be viewed as a consent to the search. As I have said, Bolger was in the hands of the agents and was in no position to do other than what he was told to do. The fact that he did not make further protest, accompanied the agents, and was there during the search, was plainly because, having signed the consent, he believed the agents had authority to make the search and he was then prepared to make as little trouble for them as possible.

Moreover, by the time he reached his house in New Jersey, about noon, he had already been under detention for an unreasonable length of time in violation of Rule 5(a). It may well be that the McNabb-Mallory rule invalidates any consents to search by conduct or otherwise given during such a period. See Watson v. United States, 101 U.S.App. D.C. 350, 249 F.2d 106.

4. The incriminating statements

 At about 6 p. m. Bolger was questioned under oath by the agents before a Customs Service reporter who took a transcript of his testimony. The questioning lasted until 7:20. By the time the questioning began more than nine hours had elapsed since Bolger was first detained. At no time had he been advised of any of his constitutional or statutory rights. He had been refused

the opportunity to obtain counsel. His home had been unlawfully searched and property had been unlawfully seized. He had been compelled to participate in another unlawful search. He had been under intermittent interrogation throughout the day by four agents and two Waterfront detectives and had been subjected to great strains and tensions.

While Bolger had a native shrewdness he showed evidence of only a limited education. According to agent O'Shea, Bolger had admitted that he was drunk the night before and had spent the night sleeping in his car, an episode which could scarcely have left him at his best.

No attempt whatsoever had been made to bring him before a United States Commissioner in compliance with Rule 5(a) and he had been induced to sign a consent to search which was wholly invalid.

The statement taken from him between 6 and 7:20 p. m. was highly incriminating both as to the merchandise seized generally and as to the Stenorette tape-recording machine which is the subject of the pending charge in the state courts.

It needs no further discussion to demonstrate that the incriminating statement was the result of a clear violation of Rule 5(a) of the Federal Rules of Criminal Procedure by the agents and of the illegal search and seizure, and I so find. The same applies to any other incriminating statements made by him after he left with the agents for New Jersey when his unlawful detention began. See Mallory v. United States, supra; McNabb v. United States, supra.

5. Remedies against the federal agents

I find (1) that on September 12, 1959 the defendant federal agents violated Rule 41(a) of the Federal Rules of Criminal Procedure by conducting an unlawful search of the plaintiff's house and unlawfully seizing property found there without a warrant, and (2) that on September 12, 1959 such defendant agents violated Rule 5(a) of the Federal Rules of Criminal Procedure by unlawfully detaining plaintiff for an unreasonable length of time without taking him before a commissioner, and obtained incriminating statements from him as a result of such unlawful detention.

I am therefore required in the exercise of the supervisory powers of this court over federal law enforcement officers, to enforce obedience to the Rules of Criminal Procedure by enjoining the defendant agents from testifying in the state criminal proceedings with respect to any evidence obtained as a result of their unlawful conduct. Defendants O'Shea, Loughman, Conlon and Patterson will therefore be enjoined from testifying in the state criminal proceedings with respect to any evidence obtained during the illegal search. and seizure conducted at Bolger's house in Keansburg, New Jersey, on September 12, 1959 and from turning over to state law enforcement authorities and producing in any state criminal proceeding any property seized at Bolger's house on that day, including the Stenorette tape-recording machine.

Defendants O'Shea, Loughman, Conlon and Patterson and defendant Zecha, the Customs Service reporter, will be enjoined (1) from testifying as to any statements made by the plaintiff after his departure from enforcement headquarters at 54 Stone Street shortly before 11 a. m. on September 12, 1959, including the statement in question and answer form taken from the plaintiff beginning at or about 6 p. m. on that day, and (2) from turning over the transcript of any statement or statements taken from plaintiff during such period to state law enforcement authorities or from producing such transcript in any state criminal proceedings.

Since the proceedings before the Waterfront Commission relating to the revocation of the plaintiff's licenses as longshoreman and hiring agent will also vitally affect his rights, a similar injunction will issue with respect to giving testimony or producing evidence or statements at any hearings before that Commission. Cf. Burack v. State Liquor Authority, D.C.E.D.N.Y., 160 F.Supp. 161.

### 6. The relief sought against defendant Cleary

Defendant Cleary, who questioned Bolger briefly on his return from New Jersey, accompanied him on the search of the 75th Street house and was present throughout the taking of the question and answer statement before the Customs Service reporter between 6 and 7:20 p. m. While Cleary did not participate in the questioning he was free to do so.

Plaintiff seeks to restrain Cleary also from testifying in state proceedings as to the statement obtained from him.

 Cleary, of course, is not a federal agent or employee. He is not bound to obey the Federal Rules of Criminal Procedure. He was present at the questioning as a representative of the Waterfront Commission, a bi-state agency of the States of New York and New Jersey as a result of information from the Customs Service to the Commission concerning the Bolger case. This was the result of the commendable cooperation between the Customs Service and the Commission who were both concerned with law enforcement on the waterfront.

The question of whether relief should be granted against Cleary is a difficult one. The Rea opinion expressly distinguished that case from Stefannelli v. Minard on the ground that no relief was asked for against state law enforcement officials. Certainly the Stefannelli case would preclude injunctive relief against Cleary in his capacity as a state law enforcement officer had he not been present at the taking of the statement.

But does this conclusion leave the plaintiff without remedy under the circumstances? If it did the injunction issued against the federal officers would be rendered in large part ineffective in so far as the incriminating statement made by Bolger is concerned. Cleary was present throughout that statement. No doubt he paid close attention to Bolger's admissions concerning his acquisition of the Stenorette tape-recording machine which is the subject of the state larceny charge. In effect, Cleary was a human recorder of the questions which were put to Bolger and the answers which he gave.

If no injunction can be issued against Cleary he is in a position to testify in the state court proceedings as to Bolger's admissions before the federal agents and thus to act as a vehicle to defeat the policy enunciated in the Rea case of protecting the privacy of the citizen against invasion in violation of the federal rules. Thus, the federal agents would be able to flout the rules and to use the fruits of their unlawful conduct in the state proceedings through the medium of Cleary.

Cleary was present at the questioning by invitation of the Customs Service. Indeed, his presence might have been an additional inducement to Bolger to answer questions more freely since Bolger had already shown concern to agent Loughman about the effect his predicament might have on his vital Waterfront Commission licenses.

In Elkins v. United States, supra, the Supreme Court noted that in the course of the entirely commendable cooperation between federal and state law enforcement agencies it was often difficult in practice to determine where federal activity ended and state activity began. The court gave as examples, Byars v. United States, 273 U.S. 28, 47 S.Ct. 248, 71 L.Ed. 520, in which evidence was excluded where the participation of a federal agent in an unlawful search by state officers was "under color of his federal office" and the search "in substance and effect was made a joint operation of the local and federal officers", (273 U.S. at page 33, 47 S.Ct. at page 250), and Gambino v. United States, 275 U.S. 310, 48 S.Ct. 137, 72 L.Ed. 293, where evidence illegally seized by state troopers was excluded in the federal courts because the court found that "the wrongful arrest, search and seizure were made solely on behalf of the United States". 275 U.S. at page 316, 48 S.Ct. at page 138.

In the case at bar the wrongful activities were all those of federal officers and were conducted or directed by them. All that was done during the period of unlawful detention, and particularly the taking of the incriminating statement from Bolger, was being done on behalf of the United States. Cleary was merely a witness to them. If Cleary had been a private citizen called in by the federal agents to be a witness to incriminating statements unlawfully obtained from Bolger, he would surely not be insulated against appropriate action by the federal courts to enforce the federal rules. The fact that he was a state agent does not insulate him either or permit him to be used as a shield to enable the federal officers to violate plaintiff's rights with impunity.

 I am therefore constrained to hold that an injunction must also issue against Cleary restraining him from testifying as to any statements made by Bolger during his interrogation by the federal agents. Cleary will be restrained not in his capacity as a state official but because he participated as a witness in the unlawful acts of the federal officers acting on behalf of the United States. Such participants are properly within the orbit of the power of the federal courts to enforce the rules against the federal agents owing obedience to them. Relief against them is a necessary incident of such power which the federal courts must grant under the circumstances.

### 7. The return of the property seized

 Bolger's request for a direction that all of the property seized be returned to him is denied. The record before me indicates that most of the items seized were brought into the United States unlawfully and there is no showing that any of them are lawfully here. Probable cause exists for the institution of forfeiture proceedings. Notwithstanding any illegality in the seizure the burden is on the plaintiff to prove that the merchandise is not forfeitable. Leaving the merchandise in the custody of the

Customs Service does not prejudice plaintiff's right to petition for remission from forfeiture and penalty. 19 U.S.C. §§ 1615, 1618. Plaintiff has not established in this proceeding that he is entitled to the return of any of the allegedly contraband seized merchandise. See Trupiano v. United States, 334 U.S. 699, 68 S.Ct. 1229, 92 L.Ed. 1663.

### III. The second action (Civil 60–1184)

 The second action can be rapidly disposed of. The only defendants are the Waterfront Commission and its individual members. Bolger seeks to restrain the Commission and its members from considering in the proceedings before it relating to his license any evidence unlawfully secured.

The Commission was set up under the Waterfront Commission Act enacted by the States of New York and New Jersey in 1953. (New York Laws 1953, c. 882 (McK.Unconsol.Laws, § 6700aa and following); N.J.Laws 1953, cc. 202, 203 (N.J.S.A. 32:23–1 and following).

Part I of the Act which encompasses the Waterfront Commission Compact, an interstate compact between the States of New York and New Jersey, was submitted to and approved by Congress. Act of August 12, 1953, c. 407, 67 Stat. 541.

Plaintiff asserts that there is jurisdiction to grant the relief sought under the Rea case because the Commission and its members are federal agents who are subject to the Federal Rules of Criminal Procedure. This contention is devoid of merit.

The Waterfront Commission is a bistate agency of the States of New York and New Jersey. The fact that Part I of the Act was approved by Congress in no way makes it a federal agency. See Rivoli Trucking Corp. v. American Export Lines, Inc., D.C.E.D.N.Y., 167 F. Supp. 937. Rea v. United States does not authorize a proceeding to enjoin a state agency from considering evidence unlawfully obtained. Indeed, to grant such relief would run directly counter to Stefannelli v. Minard, supra, and Pugach

v. Dollinger, supra. The second action must be dismissed on the merits.

The foregoing opinion constitutes my findings of fact and conclusions of law.

A decree will be submitted in accordance with this opinion on five (5) days' notice.