**Melvin CORNGOLD, Appellant,**

v.

**UNITED STATES of America,**
Appellee.

No. 19613.

United States Court of Appeals
Ninth Circuit.

Sept. 29, 1966.

Barnes, Chambers and Duniway, Circuit Judges, dissented.

**2**

Manuel L. Real, U. S. Atty., John K. Van de Kamp, Asst. U. S. Atty., Chief, Crim. Div., J. Brin Schulman, Asst. U. S. Atty., Asst. Chief, Crim. Div., John A. Mitchell, Asst. U. S. Atty., Los Angeles, Cal., for appellee.

Before CHAMBERS, BARNES, HAMLEY, JERTBERG, MERRILL, KOELSCH, BROWNING, DUNIWAY and ELY, Circuit Judges.

BROWNING, Circuit Judge:

Melvin Corngold was convicted of receiving and concealing smuggled watches in violation of 18 U.S.C.A. § 545, and of conspiring to commit that offense in violation of 18 U.S.C.A. § 371. He appeals, contending that evidence introduced against him was obtained in violation of the Fourth Amendment. We reverse.

Customs agents saw appellant carrying packages into his apartment house. They detected the presence of radioactive material in appellant's apartment by means of a "scintillator," an instrument sensitive to radiation. They observed appellant and two other men carry packages from the apartment to appellant's car, and followed appellant as he drove to the Los Angeles International Airport. En route the scintillator indicated the presence of radioactive material in appellant's car. At the airport the customs agents observed appellant and the two others carry the packages to the Trans World Airlines' cargo loading platform. After arranging for shipment of the packages to New York City, appellant and his companions left. The customs agents tested the packages with the scintillator and obtained a positive reaction. One of the packages was opened and found to contain a large quantity of watches with radium-treated dials. The opened package was resealed, and the three packages were flown to New York City. By prearrangment, customs agents met the plane on arrival in New York City, and maintained a constant surveillance of the packages until they were claimed three weeks later. Several persons were arrested. The day following

Jess Whitehill, Fred Okrand, Los Angeles, Cal., for appellant.

the New York arrests appellant was arrested in his Los Angeles office.

## I

Appellant contends that the walls of his apartment were "penetrated" and his apartment was searched by means of the scintillation detector in violation of his Fourth Amendment rights, and that it was error to admit evidence obtained in this way.

■ The agents entered the apartment building through an unlocked public entrance. They employed the scintillator in public hallways outside appellant's apartment. Goldman v. United States, 316 U.S. 129, 62 S.Ct. 993, 86 L.Ed. 1322 (1942), is controlling authority that appellant's Fourth Amendment rights were not violated. See also On Lee v. United States, 343 U.S. 747, 752–754, 72 S.Ct. 967, 96 L.Ed. 1270 (1952).

## II

Appellant asserts that opening the packages at Los Angeles International Airport and inspecting their contents was an unconstitutional search.

■ 1. The officers had no warrant, and there were no circumstances which might have justified a search without one. No arrest was made to which a search without a warrant might be incident. The government made no showing that the packages might be removed before a warrant could be obtained. Appellant was not threatening to remove them, nor was the airline, except under such conditions as the officers saw fit to impose. From the time appellant left the packages with the carrier in Los Angeles they were subject to the effective control of the customs agents. There was nothing to prevent the agents from securing a warrant on a proper showing, ei-

ther before the packages were shipped from Los Angeles or after they arrived in New York. On this record, search without a warrant was not justified even if the customs agents had probable cause to believe the packages contained contraband. Chapman v. United States, 365 U.S. 610, 613–616, 81 S.Ct. 776, 5 L.Ed.2d 828 (1961); Jones v. United States, 357 U.S. 493, 497–498, 78 S.Ct. 1253, 2 L.Ed.2d 1514 (1958); United States v. Jeffers, 342 U.S. 48, 51–52, 72 S.Ct. 93, 96 L.Ed. 59 (1951); Johnson v. United States, 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436 (1948); Agnello v. United States, 269 U.S. 20, 33, 46 S.Ct. 4, 70 L.Ed. 145 (1925).[1]

■ 2. The government makes a passing suggestion that authority for the search may be found in 19 U.S.C.A. § 482—a broad delegation of authority to customs agents to search and seize illegally imported merchandise. We have treated the outer limits of authority delegated by the statute as available only in border searches (Cervantes v. United States, 263 F.2d 800, 803, n. 5 (9th Cir. 1959); see e. g., King v. United States, 348 F.2d 814 (9th Cir. 1965); Denton v. United States, 310 F.2d 129, 132 (9th Cir. 1962); Plazola v. United States, 291 F.2d 56, 61 (9th Cir. 1961); Witt v. United States, 287 F.2d 389, 391 (9th Cir. 1961); Murgia v. United States, 285 F.2d 14, 17 (9th Cir. 1960)),[2] and there is nothing in the record to suggest that the search of appellant's packages occurred in the course of an entry into this country. However, we need not examine the statute's precise meaning, for appellant's attack upon the search of his package is based solely on constitutional grounds; and, however it is to be read, the statute could not effectively authorize a search which the Constitution prohib-

[1.] Hernandez v. United States, 353 F.2d 624 (9th Cir. 1965), is not to the contrary. There local officers, whose jurisdiction was limited to their state, searched the luggage of an interstate air passenger who was scheduled to depart before a warrant could have been obtained.

[2.] The holding in Romero v. United States, 318 F.2d 530 (5th Cir. 1963), may ap-

pear to be to the contrary, *but see* the earlier decisions of the Court of Appeals for the Fifth Circuit collected in Mansfield v. United States, 308 F.2d 221, 223 (5th Cir. 1962), and its later decision in Marsh v. United States, 344 F.2d 317, 324–325 (5th Cir. 1965).

ited. Boyd v. United States, 116 U.S. 616, 6 S.Ct. 523, 29 L.Ed. 746 (1886).

3. The government's principal contention is that the search was a private one, conducted by an employee of Trans World Airlines pursuant to a right of inspection reserved in the contract of carriage. The government places primary reliance upon United States v. Blum, 329 F.2d 49 (2d Cir. 1964). Its argument also appears to invoke the principle that the Fourth Amendment restricts only the sovereign, and therefore the exclusionary rule does not apply to evidence secured by private persons without governmental participation. Burdeau v. McDowell, 256 U.S. 465, 475, 41 S.Ct. 574, 65 L.Ed. 1048 (1921); United States v. Goldberg, 330 F.2d 30, 35 (3d Cir. 1964); United States v. Ashby, 245 F.2d 684, 686 (5th Cir. 1957). See also Irvine v. People of State of California, 347 U.S. 128, 136, 74 S.Ct. 381, 98 L.Ed. 561 (1954).

The district court did not make explicit findings as to the circumstance surrounding the search, but there was no substantial disagreement as to what occurred.

While appellant was at the counter talking with the TWA transportation agent who was preparing the waybill, a customs agent approached TWA's ramp manager and identified himself. He asked the ramp manager to talk with appellant's two companions, who were waiting nearby, and find out what he could about the shipment, including the nature of the merchandise, to whom it was going, and how often such shipments were made. The agent also asked the ramp manager to observe appellant and his companions so he could identify them later. He asked the ramp manager to show him where the packages were. The ramp manager did as the agent requested. After looking at the packages, the agent left.

After appellant and his companions departed, the four customs agents returned and spoke to TWA's transportation agent.

They conducted a scintillator test of the packages for his benefit, and told him they suspected the packages contained watches. They gave him appellant's true name and pointed out that this was not the name of the shipper appearing on the waybill. They asked him if he had authority to open the packages, and he stated that he did. They then asked him if he wanted to open the packages, and told him that if he did they wanted to be with him. He then read the inspection clause of the TWA tariff,[3] and telephoned his supervisor.

Thereupon, one agent testified, the TWA transportation agent "initially opened the package and then we helped"; and, further, after the TWA employee opened the package, "I aided him in holding the flaps so he could look inside and we could look inside." The other agent testified, "I helped open it up after he initially broke it open and we could see the contents." The agents testified that they saw tissue-wrapped packages and small boxes inside the large package, but no watches were visible. They took a number of the small boxes out of the large package and opened them. They found that the small packages contained watches marked "Swiss" which did not bear certain symbols required to be placed on foreign watches as a condition to legal importation. One of the agents wrote his initials on the inside of the lids of several of the small boxes. The agents replaced the tops on the small boxes and replaced them in the large package. They testified that they were not sure whether the TWA employee participated in opening the small boxes. The large package was resealed and the agents departed.

The TWA transportation agent testified that the customs agents told him that they suspected the packages contained smuggled watch movements. He testified that "the gist" of the conversation between him and the customs agents "was that they would like to inspect the shipment. They were wondering if I had

---

3. The clause read, "*Inspection of Shipments.* Shipments are subject to inspection by carriers to determine their ac-ceptability and to determine proper charges thereon."

authorization * * * to question the shipment, to open the shipment." He testified repeatedly that the agents asked him to open the package. The court then asked, "Was there more than one reason for your opening the package?" and the TWA employee responded, "It was opened because of the government's request." The court again asked "Was that the only reason? Would you open any package that the government requested you to open?" and the witness replied, "Yes." The TWA employee testified that he read the inspection provision of the tariff "to make sure it was legally right to open the packages," and that he called his supervisor because he "had never run into anything like this before and * * * wanted to get an okay." He confirmed the testimony of the customs agents that he had opened the large package and looked inside. He testified that he had not opened any of the small inner boxes or examined the watches, and that this had been done by the customs agents alone.

The district court overruled the motion to suppress on the authority of United States v. Blum, 329 F.2d 49 (2d Cir. 1964). The court also indicated that it thought there was probable cause for the search.

It would be difficult to justify any conclusion other than that the TWA employee participated in the search solely to serve the purposes of the government. No doubt both the customs agents and the TWA transportation agent relied upon the inspection clause in TWA's tariff and the act of TWA's agent in cutting open the outside package to furnish technical legal justification for the search. But as we have noted, the TWA employee himself testified that he opened appellant's package only because the government agents asked him to, and there is nothing else in the record which would indicate that the package was in fact opened for any purpose of the carrier—it does not appear, for example, that the rate for carrying furniture and watches differed, or that the carrier took any action on its own behalf when the mislabeling was revealed.

The fruits of a search conducted solely in aid of the enforcement of a federal statute, as this one was, are inadmissible when the search fails to meet Fourth Amendment standards. Gambino v. United States, 275 U.S. 310, 316–317, 48 S.Ct. 137, 72 L.Ed. 293 (1927). The search was in substance a federal search, cast in the form of a carrier inspection to enable the officers to avoid the requirements of the Fourth Amendment. Judge William E. Orr's statement in Taglavore v. United States, 291 F.2d 262, 266 (9th Cir. 1961), "[t]he violation of a constitutional right by a subterfuge cannot be justified, and the circumstances of this case leave no other inference than that this is what was done * * *" though made in a different factual context, is plainly applicable. See also State of Montana v. Tomich, 332 F.2d 987, 989 (9th Cir. 1964). As the Supreme Court said in Byars v. United States, 273 U.S. 28, 33–34, 47 S.Ct. 248, 250, 71 L.Ed. 520 (1927). "The Fourth Amendment was adopted in view of long misuse of power in the matter of searches and seizures both in England and the colonies; and the assurance against any revival of it, so carefully embodied in the fundamental law, is not to be impaired by judicial sanction of equivocal methods, which, regarded superficially, may seem to escape the challenge of illegality but which, in reality, strike at the substance of the constitutional right." See also Lane v. Wilson, 307 U.S. 268, 275, 59 S.Ct. 872, 83 L.Ed. 1281 (1939).

But the evidence would be excludable in the present case even if the TWA employee had not acted solely to satisfy the government's interest in viewing the contents of the package, but instead had initiated and participated in the search for reasons contemplated by the inspection clause in TWA's tariff. The customs agents joined actively in the search. They held open the flaps of the large package; removed, opened, and inspected the contents of the small boxes

which it contained; and marked the small boxes for future identification. Thus, at the very least, the search of appellant's package was a joint operation of the customs agents and the TWA employee. When a federal agent participates in such a joint endeavor, "the effect is the same as though he had engaged in the undertaking as one exclusively his own." Byars v. United States, supra, 273 U.S. 28, at 33, 47 S.Ct. 248 at 250, 71 L.Ed. 520.[4] As Justice Frankfurter said in Lustig v. United States, 338 U.S. 74, 78–79, 69 S.Ct. 1372, 1374, 93 L.Ed. 1819 (1949):

> [A] search is a search by a federal official if he had a hand in it * * *. The decisive factor in determining the applicability of the *Byars* case is the actuality of a share by a federal official in the total enterprise of securing and selecting evidence by other than sanctioned means. It is immaterial whether a federal agent originated the idea or joined in it while the search was in progress. So long as he was in it before the object of the search was completely accomplished, he must be deemed to have participated in it. Where there is participation on the part of federal officers it is not necessary to consider what would be the result if the search had been conducted entirely by State officers. Evidence secured through such federal participation is inadmissible for the same considerations as those which made Weeks v. United States, 232 U.S. 383 [34 S.Ct. 341, 58 L.Ed. 652], the governing principle in federal prosecutions.

The facts in United States v. Blum, 329 F.2d 49 (2d Cir. 1964), are not clear from the opinion. There is a suggestion that the package involved was opened by customs agents "with permission" of the carrier. 329 F.2d at 50. On the other hand, the opinion indicates that the customs agents secured a search warrant after the package was initially opened

and its contents disclosed (ibid.), and the ruling of the court is stated in language which suggests that the carrier itself opened the carton and examined its contents for the purposes contemplated by its reservation of a right of inspection. 329 F.2d at 52. We would of course agree that if a carrier, while inspecting packages for its own purposes pursuant to a provision in the contract of carriage, discovers contraband and notifies the customs agents of that fact, and the agents then secure a warrant on the basis of this information and conduct a search, the search is entirely proper. This is precisely the procedure which the Fourth Amendment contemplates.

■ 4. The government has not made the alternative argument that even if the inspection of appellant's package was a federal search, it was consented to by the carrier and was for that reason proper. Nonetheless, this possible ground for overruling appellant's motion to suppress is presented by the facts and we therefore deal with it.

In Stoner v. State of California, 376 U.S. 483, 84 S.Ct. 889, 11 L.Ed.2d 856 (1964), the Supreme Court rejected the argument that the search of a hotel room conducted without the occupant's consent was lawful because conducted with the consent of the hotel clerk. Justice Stewart said (376 U.S. at 489, 84 S.Ct. at 893):

> It is important to bear in mind that it was the petitioner's constitutional right which was at stake here, and not the night clerk's nor the hotel's. It was a right therefore, which only the petitioner could waive by word or deed, either directly or through an agent. It is true that the night clerk clearly and unambiguously consented to the search. But there is nothing in the record to indicate that the police had any basis whatsoever to believe that the night clerk had been authorized by

---

4. If such a search does not meet Fourth Amendment standards, evidence which it discloses is excludable even though the search would have been lawful had the federal agents not participated. Lustig v. United States, supra, 338 U.S. at 79, 69 S.Ct. 1372; Byars v. United States, supra, 273 U.S. at 29, 47 S.Ct. 248.

the petitioner to permit the police to search the petitioner's room.

Since the Fourth Amendment protects "papers, and effects," as well as persons and houses (United States v. Jeffers, 342 U.S. 48, 51, 79 S.Ct. 93, 96 L.Ed. 59 (1951)), no principled distinction can be drawn between this case and *Stoner*.

With the exception of our decision in Marshall v. United States, 352 F.2d 1013 (9th Cir. 1965), prior rulings of the courts of appeals are consistent with this conclusion.

Appellant's standing to assert the illegality of the search of his package has not been challenged. Cases relating to that problem are therefore not relevant. Compare United States v. Reiburn, 127 F.2d 525, 526 (2d Cir. 1942); United States v. Ebeling, 146 F.2d 254, 257 (2d Cir. 1944); United States v. Walker, 190 F.2d 481, 483 (2d Cir. 1951); United States v. Walker, 197 F.2d 287, 289 (2d Cir. 1952); and Von Eichelberger v. United States, 252 F.2d 184, 186 (9th Cir. 1958), with Jones v. United States, 362 U.S. 257, 260–267, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960).

Also irrelevant are cases holding that the rights of the owner of personal property are not violated where the property is observed during a search made with the consent of another who has an equal and independent right of access to the place searched. See, e. g., Nelson v. People of State of California, 346 F.2d 73, 77 (9th Cir. 1965); Burge v. United States, 342 F.2d 408 (9th Cir. 1965); Von Eichelberger v. United States, 252 F.2d 184, 186 (9th Cir. 1958); Woodard v. United States, 102 U.S.App.D.C. 393, 254 F.2d 312 (1958). The independent right to authorize entry does not depend upon the wishes of the owner of personal property which may be on the premises. Roberts v. United States, 332 F.2d 892, 897 (8th Cir. 1964). Thus, TWA could grant access to its own loading area without regard to appellant's wishes. But the contents of appellant's package were not observed during a search of TWA's loading area. They were disclosed by a search of the package itself. TWA and its employees had no right of access to appellant's package independent of appellant's consent. The right of the customs agents to search appellant's package must rest upon a showing that appellant himself waived his personal right of privacy "by word or deed, either directly or through an agent." Stoner v. State of California, supra, 376 U.S. at 489, 84 S.Ct. at 893. See also Holzhey v. United States, 223 F.2d 823 (5th Cir. 1955).

The owner of personal property may bring his right of privacy to an end by abandoning the property. See e. g., Abel v. United States, 362 U.S. 217, 240–241, 80 S.Ct. 683, 4 L.Ed.2d 668 (1960); Feguer v. United States, 302 F.2d 214, 248–249 (8th Cir. 1962). He may expressly authorize another to acquiesce in a search of his personal property. Or he may give another such complete and unrestricted freedom over his property that he will be held to have accepted the risk that the person will consent to a search; he may, in other words, impliedly authorize another to consent to an invasion of his right of privacy. Sartain v. United States, 303 F.2d 859 (9th Cir. 1962), and United States v. Eldridge, 302 F.2d 463 (4th Cir. 1962), are such cases. See generally Note, 113 U.Pa.L.Rev. 260, 272–76 (1964).

Appellant did not abandon his package; and mere surrender of custody to a carrier did not forfeit appellant's right to privacy. See Ex parte Jackson, 96 U.S. 727, 733, 24 L.Ed. 877 (1878); Santana v. United States, 329 F.2d 854, 856 (1st Cir. 1964); Oliver v. United States, 239 F.2d 818, 820–821, 61 A.L. R.2d 1273 (8th Cir. 1957). He did not expressly authorize TWA to consent to search of his package by customs agents. Therefore, unless appellant impliedly authorized TWA to acquiesce in such a search, TWA's consent could not bind appellant. The facts negate any intention to grant TWA such broad authority. Appellant's package, securely wrapped and tied, was delivered to the airline solely for transportation from Los Angeles to New York, and the inspection clause in

TWA's tariff authorized examination only by the carrier itself.[5]

In Marshall v. United States, supra, 352 F.2d 1013, we held that a person entrusted with the possession of a briefcase by its owner with instructions that it was not to be given to anyone else, could validly consent to search of the briefcase by agents of the Federal Bureau of Investigation. It is apparent that the result which we reached in *Marshall* is inconsistent with our ruling in this case, and, we believe, with the principle announced in Stoner v. State of California, supra, 376 U.S. at 489, 84 S.Ct. 889. *Marshall* is therefore overruled.

It is perhaps worth repeating that although this court may now be faced with the choice of justifying a warrantless search or letting a guilty man go free, that choice did not face the customs officers. They could have secured a warrant, or, if probable cause for search was lacking, continued their investigation until information establishing probable cause was obtained.

### III

It appears probable that all or substantially all of the evidence implicating appellant was secured by the government through exploitation of the information obtained by the illegal search of appellant's package, and would be inadmissible for that reason. Wong Sun v. United States, 371 U.S. 471, 488, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). It also appears probable that any ruling we might make on other grounds urged for reversal would serve no purpose. If we are in error, the government may so advise us on petition for rehearing.

Reversed.

BARNES, Circuit Judge (dissenting):

I concur only in that portion of the majority opinion which holds the appellant's Fourth Amendment constitutional rights were not violated by the scintillator examination of his apartment house. (Part I of majority opinion, supra.)

### I

I respectfully dissent from the majority conclusion that this record discloses an unconstitutional search of two packages left for shipment to New York at the Los Angeles International Airport by the appellant on September 30, 1962.

The majority opinion rests upon the alleged violation of the Fourth Amendment prohibiting unreasonable searches and seizures. Concededly, the officers had no search warrant, and no arrest took place to which the search might have been incident. But I cannot agree with the conclusion that without a warrant or an arrest, "there were no circumstances which might have justified a search * * *."

As Mr. Justice Tom Clark said in his dissent in Chapman v. United States, 365 U.S. 610, 620, 81 S.Ct. 776, 782, 5 L.Ed. 2d 828 (1961): "For the life of me I cannot see why this * * * search without a warrant was 'unreasonable.'"

In his Cardozo Lecture before The Association of the Bar of the City of New York, Chief Justice Traynor of the California Supreme Court pointed out that in Mapp v. Ohio, 367 U.S. 643, 657, 81 S.Ct. 1684, 1693, 6 L.Ed.2d 1081 (1961), Mr. Justice Clark asserted: "There is no war between the Constitution and common sense." The first, primary and most important function of the criminal legal process is to ascertain the truth—the guilt or innocence of the person accused of crime.[1] It is my belief that the majority opinion strains to find reason for reversing this appellant's conviction, and distorts the factual picture in order to accomplish this purpose by concluding the search was an unreasonable one.

---

5. See note 3.

1. A contemporary legal writer (in suggesting certain safeguards that should be practiced by trial judges in order to protect a defendant's rights when identified by eye-witnesses as a malefactor) expresses concern about the current criminal process, and reminds us:

> "The main function of the criminal process, however, is to distinguish between guilt and innocence and to assure, in so far as it is humanly possible, and without the sacrifice of any of the

We do not deal in absolutes. Searches and seizures as such are not prohibited by our Constitution, but only those which, because of the particular and peculiar facts and circumstances surrounding the actual performance of their sworn duties by law enforcement officers, cause the courts of this land, in the exercise of good common sense, to declare that conduct "unreasonable." (Amendment IV.) [2]

In one of the leading Supreme Court cases on search and seizure, it was stated:

"In dealing with probable cause, however, as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." Brinegar v. United States, 338 U.S. 160, 175, 69 S.Ct. 1302, 1310, 93 L.Ed. 1879 (1944).

That the issue as to reasonableness of a search differs with the facts of each case has long been recognized by the Supreme Court. The rules for search of a home differ from those relating to the search of an automobile, or an airplane.[3]

Every case on appeal has a factual background which must be fairly developed before the "feel" of the case can be sensed. The factual recital in the majority opinion is unusually brief. It starts with "Customs agents saw appellant carrying packages into his apartment house." No explanation is given as to why the Customs agents were interested in this appellant or what went into his apartment house. For all the majority opinion discloses, the Customs agents may have been casual observers of an isolated and innocent act of an ordinary citizen, and the use of "scintillators" in the apartment house a casual search for radio active materials. That is not this case.

To understand this case, I think it essential to have in mind many facts that do not appear in the majority opinion. For more than twenty months, at the very least, United States Customs agents had been suspicious of appellant's activities with respect to the smuggling of foreign watches across the American-Mexican border. As early as January of 1961, their suspicions had so far materialized as to cause them to wire-tap the business telephone of appellant Corngold. We have no information in the record as to the legality of that wire-tap; the wire-tap was unsuccessful—"it did not work." (R.T. on Motion to Suppress, p. 109.)

We also know from the record that for several years Swiss watch movements were being irregularly smuggled across

rights of an accused, that the innocent man is found innocent, and the guilty man guilty."—Wall, Eye-Witness Identification In Criminal Cases (1965).

One federal judge with considerable trial experience describes the statement above as a "wholesome attitude," and states:

"We hear so much about protecting the rights of defendants that it is salutary to find someone emphasizing the necessity of convicting the guilty."—Holtzoff, Book Review, 52 A.B.A.J. 170 (1966).

2. "The Constitution condemns only an *unreasonable* search. As my Brother FRANKFURTER says, that determination 'turns on the circumstances presented by a particular situation.'" Mr. Justice Clark dissenting in Chapman v. United States, supra, 365 U.S. at 618–619, 81 S. Ct. at 781. And see United States v. Ventresca, 380 U.S. 102, 107, n. 2, 85 S. Ct. 741, 13 L.Ed.2d 684 (1965); Jones

v. United States, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960); Husty v. United States, 282 U.S. 694, 51 S.Ct. 240, 75 L.Ed. 629 (1931); Godette v. United States, 199 F.2d 331 (4th Cir. 1952).

3. "Common sense dictates, of course, that questions involving searches of motorcars or other things readily moved cannot be treated as identical to questions arising out of searches of fixed structures like houses. For this reason, what may be an unreasonable search of a house may be reasonable in the case of a motorcar. See Carroll v. United States, supra, 267 U.S. [132], at 153 [45 S.Ct. 280, 69 L. Ed. 543]." Preston v. United States, 376 U.S. 364, 366–367, 84 S.Ct. 881, 883, 11 L.Ed.2d 777 (1964). And see Jones v. United States, supra, note 2; Brinegar v. United States, supra; Patenotte v. United States, 266 F.2d 647, 650 (5th Cir. 1959); Kernick v. United States, 242 F.2d 818, 821 (8th Cir. 1957).

the Mexican-United States border from Baja, California into California, where they were distributed about the country, usually from New York. And we know further from the record that on August 30, 1961, "a large number" of smuggled watches were picked up at San Ysidro on the American side of the border.

We also learn from the record that Corngold using the assumed name of "Futterman" had made "a number" of similar shipments by air freight over "a six months time,"—"a half a dozen"— including one on September 1, 1962, to a "J. Singer" of New York, and one on September 15, 1962, to an "A. Cooperman" of New York. The appellant Corngold was known to the Trans World Airlines' employees as "Futterman" because of his previous shipments of merchandise under that name.

We would be naive were we to believe that no observation of Corngold's activities took place during this period of twenty months. But from the record, we only know that for at least six days prior to September 30, 1962, "a reliable informant," a "special employee" [4] of the Bureau of Customs, had appellant's home under surveillance. On that day he parked his car, once during the morning and again at 1:00 P.M., near Corngold's residence; saw him leave in a Buick automobile at 3:00 P.M. and return at 4:00 or 4:30 P.M.; and thereafter saw him carry five heavy packages into his house. Within an hour a "scintillator" had been obtained from San Pedro, California (a distance of some twenty miles) and its positive result for radium activity noted from *outside* the appellant's apartment. This brings the time to between 5:00 and 6:00 P.M.

Between 6:30 P.M. and 7:30 P.M. on September 30, 1962, the appellant and two companions carried three heavy packages from the apartment building and placed them in the Buick automobile, which was driven to the Los Angeles International Airport.[5] Five or six times on the ten mile trip from appellant's apartment to the airport, the scintillator disclosed positive findings of radium each time the government car passed the Buick. Two or three readings from a different scintillator in a different government auto also gave positive radium readings each time the appellant's Buick was passed.

I consider the time element here of extreme importance. To understand the time element, I pass to the other end of the transcontinental flight. We know from the record the goods shipped by the appellant arrived at the New York Airport at 9:00 A.M. on October 1st, 1962, on T.W.A.'s flight #102.

This court can take judicial notice of differences in time zones.[6] T.W.A.'s flight #102 left Los Angeles on the night of September 30, 1962, presumably just before midnight. The Customs' men were working against the deadline of a scheduled departure. The three packages of "office equipment" shipped by appellant under an assumed name to New York were received by the air line at Los Angeles at 9:30 P.M., according to the notation on Exhibit 16. The testimony places the arrival at the airport at an earlier hour, 8:30–9:00 P.M. Shortly after the receipt in Los Angeles the appellant and his two companions left the T.W.A. freight headquarters, and the Customs agents followed, returning about a half hour later. It was only then that the Customs agents could safely and logically conclude by scintillator tests that the content of these three packages, rather than

---

4. Frequently, a "special employee" is a euphemism for "stool pigeon." Here the informant, Mr. Mettler, was an undercover private investigator with a history of previous work for the Customs Bureau. He had worked on twelve different occasions in the previous five years. He first had reviewed the Bureau of Customs files on Melvin Corngold.

5. Appellant lived at 3333 West Fourth Street, Los Angeles, California. We can take judicial notice of the fact that this address is some ten miles from the Los Angeles International Airport.

6. Three hours difference between New York and Los Angeles, not considering daylight savings problems.

some other object being carried in the Buick automobile [7] was the cause of the observed radium activity. This was "about" 10:00 P.M. (Tr. 363). Witness Devan then telephoned his supervisor to obtain permission to inspect the contents. We are not told how long this took, but the government agents had substantially less than two hours [7a] late on Sunday night to act with respect to the packages, and to determine what, could be done to finally ascertain if a violation of Customs law was occurring.[8]

To me, the Customs officers did the normal, common sense, rational and reasonable thing. *They* did not open the packages.[9] They requested the carrier, who had custody and control of the packages, to open them for inspection.

From a physical standpoint, had the Customs officers desired to open the packages without the consent of the air lines, they undoubtedly could have done so, irrespective of the legality of such an action. But they did not do this; they asked the air lines employee if he had authority to open the packages, and when he said he had, they stated they wanted to be present when he did open them. The officers then waited until the air line employee (a) had checked his company's own rules and regulations, and

(b) had checked with his supervisor. The employee wanted "to make sure it was legally right to open the packages." When he had satisfied himself he had such a right by *his* reading of the tariff and waybill, and by *his* check with his superior, and with no coercion, or even a hint of pressure from the Customs officers, then, and only then, did the air lines employee open the packages.

With all the facts outlined herein in mind, I conclude: the search was justified as reasonable (1) because there was probable cause to believe an unlawful act —the receiving, and the facilitating of the transportation of merchandise known to have been smuggled into the United States—was taking place in the presence of the officers; (2) because of the right to search given by 19 U.S.C. § 482 to Customs agents; (3) because this was a lawful search made by a T. W.A. employee, and not by the Customs agents.

## II

The majority opinion (in paragraph "1" of Part II) does not deny that there was probable cause to believe that the packages contained contraband. I agree. But even if this be so, say the majority *"on this record,* search without a warrant

---

**7.** It conceivably might have been the auto itself causing the activity had not the auto alone been checked that afternoon and found negative.

**7a.** Compare this *less* than two hours available time with the *more* than two hours available time disclosed in Hernandez v. United States, 353 F.2d 624, where in 1965 a panel of this court, with respect to an earlier departure hour on a similar Sunday evening, held it was impractical to secure a warrant because the Customs inspectors said: "[A] warrant could not have been obtained until the following morning." Id. at 627.

In *Hernandez,* relying largely on the trial court's determination there had been probable cause, and " '[g]iving due weight to that finding' * * *, we arrive at the same conclusion." (Id. at 627.) Here the trial court had *twice* passed upon the issue favorably to the government's position.

**8.** The majority opinion (last paragraph, part II) refuses to recognize the immedia-

cy of the problem. It states: "They [the Customs officers] could have secured a warrant, or, if probable cause for search was lacking, continued their investigation * * *."

There are no facts in the record to support a conclusion that either choice was possible, *unless* they permitted the smuggled merchandise to leave their jurisdiction, and run the risk of the crime being accomplished. Cf. United States v. Zimmerman, 326 F.2d 1, 4 (7th Cir. 1963), which holds:

"The seizure of the suitcases [at an airport] without a warrant to prevent their imminent removal from the jurisdiction was reasonable. * * *"

See also United States v. Rabinowitz, 339 U.S. 56, 65, 70 S.Ct. 430, 94 L.Ed. 653 (1950); United States v. Kancso, 252 F.2d 220, 223 (2d Cir. 1958).

**9.** This statement stands uncontradicted in the record. (Tr. p. 113, ll. 10–15; Tr. pp. 138, 259, 276, 351, 376.)

was not justified." (Emphasis added.) With this I cannot agree.

Cited to support this conclusion of law are (a) Chapman v. United States, supra; (b) Jones v. United States, 357 U.S. 493, 497–498, 78 S.Ct. 1253, 2 L.Ed. 2d 1514 (1958); (c) United States v. Jeffers, 342 U.S. 48, 51–52, 72 S.Ct. 93, 96 L.Ed. 59 (1951); (d) Johnson v. United States, 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436 (1948); and (e) Agnello v. United States, 269 U.S. 20, 33, 46 S.Ct. 4, 70 L.Ed. 145 (1925). I consider each in turn.

(a) *Chapman,* supra, is the case of the whiskey still in a rented house, where permission was obtained from the owner, not the tenant. The facts do not resemble those of this case. In *Chapman,* Mr. Justice Whittaker rested its reversal on Johnson v. United States, supra, and Taylor v. United States, 286 U.S. 1, 52 S.Ct. 466, 76 L.Ed. 951 (1937). *Taylor* was the case of the "whiskey odor" coming from a garage, and *Johnson* was the case of an "opium odor" coming from a hotel room, wherein this court's opinion was reversed.

In both these cases, and in *Chapman,* the Supreme Court emphasizes that it is for the magistrate to make the decision as to whether the evidence is sufficient to support the issuance of a search warrant, not the arresting officers, *unless there are exceptional circumstances.* Mr. Justice Whittaker quotes with apparent approval from Johnson, supra:

" 'There are exceptional circumstances in which, on balancing the need for effective law enforcement against the right of privacy, it may be contended that a magistrate's warrant for search may be dispensed with. But this is not such a case.' 333 U.S. at pages 13–15 [68 S.Ct. at pages 368–370]."

and then states:

"Here, as in that case, 'No reason is offered for not obtaining a search warrant except the inconvenience to the officers and some slight delay necessary to prepare papers and present the evidence to a magistrate. * * *

*The search was of permanent premises, not a movable vehicle. No evidence or contraband was threatened with removal or destruction,* except perhaps the fumes which we suppose in time would disappear.' 333 U.S. at page 15 [68 S.Ct. at page 369]." (Emphasis added.)

The considerations underscored above are the precise exceptional facts existing in this case which make the majority's reliance upon the *Chapman, Johnson* and *Taylor* cases inappropriate, to my mind.

Further, the government in *Chapman,* supra, relied, in justification of the officers' conduct, not on the sufficiency of the factual evidence to permit the officers to act without a warrant, but on a landlord's common law right to enter his premises "to view waste." 365 U.S. at 616, 81 S.Ct. at 779. This theory the Supreme Court rejected, in the absence of adequate Georgia statutory enactment.

Here the government relies not only on the action of the T.W.A. employee in opening the packages, but on the sufficiency of the evidence to authorize the examination without a warrant, under the circumstances of this case.

"Surely it is fair to say that the lower courts and prosecutors have a right to proceed on the assumption, on the basis of controlling decisions, that whether or not a search is 'unreasonable' turns on the circumstances presented by a particular situation, as a matter of substantive determination." Mr. Justice Frankfurter, concurring in *Chapman,* supra, 365 U.S. at 618, 81 S.Ct. at 781.

(b) Jones v. United States, supra, holds that probable cause for belief that certain articles subject to seizure are in a home cannot *of itself* justify a search without a warrant, citing Agnello v. United States, supra. In this case, the probable cause does not stand by itself. The majority opinion recognizes this qualification in stating: *"On this record,* search without a warrant was not justified even if the customs agents had probable cause to believe the packages contained contraband." On the record recited in the ma-

jority opinion and in this dissent, I maintain the search was justified without a warrant or an arrest.

In *Jones,* the officers searched in the night without a warrant for a "night search"—only a warrant for a day search had been issued. They did this, again, with respect to a house, not a "movable" object, and, what is more important, without a nighttime warrant, *"despite their ability, under the circumstances, to have sought such a warrant before entering the house,"* 357 U.S. at 497, 78 S.Ct. at 1256. (Emphasis added.)

Further, this being "a nighttime intrusion into a private home," (357 U.S. at 498, 78 S.Ct. at 1257; Rule 41(c), Fed.R. Crim.P.) the rule of "probable cause" for a daytime warrant falls before the "positive affidavits" requirements for a nighttime warrant. Hence probable cause alone is insufficient. 357 U.S. at 499, 78 S.Ct. at 1257.[10]

*Jones,* supra, does not in my opinion support the majority opinion.

(c) United States v. Jeffers, supra, involved the entry into the hotel room of respondent's aunts, without warrant for search, warrant for arrest, or permission, and in the absence of any occupant. "[T]he Government admits that the search of the hotel room, as to the Misses Jeffries [the aunts], was unlawful. * * * no movable vehicle was involved, nor was there * * * [involved] imminent * * * removal * * * of the property intended to be seized. In fact, the officers admit they could have easily prevented any such * * * removal by merely guarding the door." 342 U.S. at 51-52, 72 S.Ct. at 95.

The *Jeffers* case deals primarily with the issue of the defendant's "necessary standing"—not with the "reasonableness" of the search in view of the "circumstances presented by the particular situation." "The law does not prohibit every entry,

without a warrant, into a hotel room. Circumstances might make exceptions and certainly implied or express permission is given to such persons as maids, janitors or repairmen in the performance of their duties," 342 U.S. at 51, 72 S.Ct. at 95.

(d) Johnson v. United States, supra, has been discussed under (a) above.

(e) Agnello v. United States, supra, was again a case involving the search of a dwelling house, entered without a search warrant, after the arrest of the defendant, at a place removed from the house. No clearer case of the existence of unlimited time to obtain a warrant, and the total absence of any exceptional circumstances presented by the particular factual situation, could be imagined than the facts found in the *Agnello* case.

This case falls within the exceptions specified in the five cases cited and relied upon by the majority, and not within the general rule stated by those cases.

With the exception of the two opening sentences of part II, paragraph "1", of the majority opinion, I am forced to disagree with it completely, both as to the factual statements, and the legal conclusions based thereon. On the facts and circumstances of this case, I believe probable cause existed of such a character as to lead a reasonably discreet and prudent man to believe that smuggled goods existed in the air shipment which were subject to seizure. Lawson v. United States, 254 F.2d 706, 708 (8th Cir. 1958); Hernandez v. United States, 353 F.2d 624 (9th Cir. 1965).

### III

In paragraph "2" of part II, the opinion states the government makes "a passing suggestion that authority for the search may be found in 19 U.S.C.A. § 482." Whether or not this be an accurate reference as to the extent of the govern-

---

10. Not only is the distinction between entry during daylight and nighttime expressed in court decisions and the Federal Rules of Criminal Procedure, but the distinction between the sanctity of the home and the business establishment or other premises

is recognized by congressional enactment. For example, see the right of entry granted to Customs officers as to all premises save "dwelling houses" in 19 U.S.C. § 1595(b).

ment's reliance on the statute, I cannot dismiss the point, as the majority opinion does, without considering "the statute's precise meaning." Nor can I agree with the conclusion that we have already "treated the outer limits of authority delegated by the statute" and limited it to "border searches," and that this law is inapplicable in any event because of the majority's determination, by inference, that this search was not a border search. This is accomplished by restricting "border searches" strictly to those made "in the course of an entry into this country." By this, I assume the majority opinion refers to the actual physical entry, or crossing of the imaginary border line. If so, it is clearly not in accordance with the law as we have long, and quite recently, enunciated it.

19 U.S.C. § 482 reads as follows:

"§ 482. *Search of vehicles and persons.*

Any of the officers or persons authorized to board or search vessels may stop, search, and examine, as well without as within their respective districts, any vehicle, beast, or person, on which or whom he or they shall suspect there is merchandise which is subject to duty, or shall have been introduced into the United States in any manner contrary to law, whether by the person in possession or charge, or by, in, or upon such vehicle or beast, or otherwise, and to search any trunk or envelope, wherever found, in which he may have a reasonable cause to suspect there is merchandise which was imported contrary to law; and if any such officer or other person so authorized shall find any merchandise on or about any such vehicle, beast, or person, or in any such trunk or envelope, which he shall have reasonable cause to believe is subject to duty, or to have been unlawfully introduced into the United States, whether by the person in possession or charge, or by, in, or upon such vehicle, beast, or otherwise, he shall seize and secure the same for trial."

Thus the Customs agents, being among those authorized to board or search vessels, are authorized to search "any trunk or envelope, *wherever found,* in which he may have a reasonable cause to suspect there is merchandise which was imported contrary to law; * * *." (Emphasis added.)

If this means what it says, the Customs officers could have stopped and searched the Corngold auto, on the way to the airport, or Corngold himself, with his companions, as they carried the smuggled watches to the air freight terminal. Having been cautious enough to have waited for more proof (the fictitious name given (obtained from the air line employee); the fact of previous shipments; and the subsequent scintillator tests), can we say the Customs agents had no right of search? Or that they should have waited until the smuggled shipment had been placed aboard the airplane?

On June 7, 1966, this court stated as follows:

"Customs officers have long been given express authority to 'stop, search, and examine, as well without as within their respective districts, any vehicle * * * or persons, on which he or they shall suspect there is merchandise which is subject to duty, or shall have been introduced into the United States in any manner contrary to law.' [19 U.S.C. § 482; see: Act of March 3, 1815, 3 Stat. 231, 232; Act of July 18, 1866, 14 Stat. 178.] Indeed, Customs officers are authorized 'at any time to go on board * * * any * * * vehicle at any place in the United States * * * and search * * * the vehicle and every part thereof * * * and to this end may hail and stop such vehicle, and use all necessary force to compel compliance.' [19 U.S.C. § 1581(a); see Act of July 31, 1789, 1 Stat. 29, 43.]

"Furthermore: 'If upon the examination of any * * * vehicle it shall appear that a breach of the laws of the United States is being or has been committed so as to render such * * * vehicle, or the merchandise, or any part thereof, on board of, or brought into the United States by, such * * *

vehicle, liable to forfeiture or to secure any fine or penalty, the same shall be seized and any person who has engaged in such breach shall be arrested.' [19 U.S.C. § 1581(e).]

"In conferring upon Customs officers such broad authority, circumscribed only by Constitutional limitations of the Fourth Amendment, the Congress has in effect declared that a search which would be 'unreasonable' within the meaning of the Fourth Amendment, if conducted by police officers in the ordinary case, would be a reasonable search if conducted by Customs officials in lawful pursuit of unlawful imports. Judicial recognition of this distinction has given rise to the term 'border search', in order to distinguish official searches which are reasonable because made solely in the enforcement of Customs laws from other official searches made in connection with general law enforcement.

"Validity for this distinction is found in the fact that primordial purpose of a search by Customs officers is not to apprehend persons, but to seize contraband property unlawfully imported or brought into the United States. [See The Atlantic, 68 F.2d 8 (2d Cir. 1933).] Accordingly, it is well settled that a search by Customs officials of a vehicle, at the time and place of entering the jurisdiction of the United States, need not be based on probable cause; that 'unsupported' or 'mere' suspicion alone is sufficient to justify such a search for purposes of Customs law enforcement. [Cervantes v. United States, 263 F.2d 800, 803, n. 5 (9th Cir. 1959); see: Carroll v. United States, 267 U.S. 132, 154, 45 S.Ct. 280, 69 L.Ed. 543 (1925); Boyd v. United States, 116 U.S. 616, 623, 6 S.Ct. 524, 29 L.Ed. 746 (1886); Hammond v. United States, 356 F.2d 931 (9th Cir. 1966); King v. United States, 348 F.2d 814, 817 (9th Cir. 1965); Jones v. United States, 326 F.2d 124, 130 (9th Cir. 1964, concurring opinion of Judge Duniway); Denton v. United States, 310 F.2d 129 (9th Cir. 1962); Mansfield v. United States, 308 F.2d 221 (5th Cir. 1962); Plazola v. United States, 291 F.2d 56 (9th Cir. 1961); Witt v. United States, 287 F.2d 389 (9th Cir. 1961); Murgia v. United States, 285 F.2d 14 (9th Cir. 1960); Landau v. United States Attorney, 82 F.2d 285 (2nd Cir. 1936); United States v. Wischerth, 68 F.2d 161 (2nd Cir. 1933); United States v. Yee Ngee How, 105 F.Supp. 517 (N.D.Calif. 1952).]

"Where, however, a search for contraband by Customs officers is not made at or in the immediate vicinity of the point of international border crossing, the legality of the search must be tested by a determination whether the totality of the surrounding circumstances, including the time and distance elapsed as well as the manner and extent of surveillance, are such as to convince the fact finder with reasonable certainty that any contraband which might be found in or on the vehicle at the time of search was aboard the vehicle at the time of entry into the jurisdiction of the United States. Any search by Customs officials which meets this test is properly called a 'border search'. [See: Leeks v. United States, 356 F.2d 470 (9th Cir. 1966); King v. United States, supra, 348 F.2d 814; Marsh v. United States, 344 F.2d 317 (5th Cir. 1965); Jones v. United States, supra, 326 F.2d at 130 (concurring opinion of Judge Duniway); Mansfield v. United States, supra, 308 F.2d 221; Cervantes v. United States, supra, 263 F.2d at 803, n. 5; Ramirez v. United States, 263 F.2d 385 (5th Cir. 1959); Bolger v. United States, 189 F.Supp. 237 (S. D.N.Y.1960), aff'd Bolger v. Cleary, 293 F.2d 368 (2nd Cir. 1961); United States v. Rodriguez, 195 F.Supp. 513 (S.D.Tex.1960), aff'd 292 F.2d 709 (5th Cir. 1961); United States v. Yee Ngee How, supra, 105 F.Supp. 517;

People v. Furey, 42 Misc.2d 579, 248 N.Y.S.2d 460 (1962).]" Alexander v. United States, 362 F.2d 379 (9th Cir. 1966).[11]

11. I am aware that the last paragraph just quoted from Alexander v. United States, supra, states a factual condition for border searches which is not present in this case, i. e., "that any contraband which might be found in or on the vehicle at the time of search *was aboard the vehicle at the time of entry into the jurisdiction of the United States.*" (Emphasis added.) I do not, however, believe that it is necessary that the goods seized must be aboard the same vehicle in which they entered the United States in order to make a search a "border search" within the meaning of 19 U.S.C. § 482. As the *Alexander* opinion had already noted (in the third paragraph from the opinion quoted above), the distinguishing characteristic of a search under 19 U.S.C. § 482 is the unusual standard of "reasonableness" applied to such searches because of the peculiar circumstances in which they are made, and that "Judicial recognition of this distinction has given rise to the term 'border search', in order to distinguish official searches which are reasonable because made solely in the enforcement of Customs laws from other official searches made in connection with general law enforcement." It is very common for a judicial opinion to state a legal rule in the narrowest and most restricted form which will cover the circumstances present in the particular case, and I believe that such a custom was followed by the court in *Alexander* in setting forth as a condition for a "border search" that the contraband found be in the vehicle in which it entered the United States. In *Alexander* the contraband heroin was seized in a search of the car in which it had crossed the border, and the facts of the case thus fit the restricted form of the rule given in the opinion.

The view that the term "border searches" goes beyond searches of the vehicle in which the contraband was imported finds support in the very cases cited by the court in *Alexander* as authority for its definition. In Bolger v. United States, 189 F.Supp. 237 (S.D.N.Y.1960), aff'd 293 F.2d 368 (2d Cir. 1961), for example, the court treated as a "border search" requiring neither warrant nor arrest a factual situation where a dock worker who was not entering the United States removed a carton from a pier containing goods which had already come to rest within the United States following importation. Mansfield v. United States, 308 F.2d 221 (5th Cir. 1962) and People v. Furey, 42 Misc.2d 579, 248 N.Y.S.2d 460 (1964), involved searches of persons, not vehicles, entering the United States at airports. United States v. Yee Ngee How, 105 F. Supp. 517 (N.D.Calif.1952), involved the search of a person who was passing back and forth between a ship and shore after both the ship and the person had already passed Customs inspections. It does not seem logical to me that the transfer of contraband from one vehicle to another, after passing over a border into the United States, would defeat the provisions of the statute permitting Customs officers to "stop, search, and examine * * * *any vehicle* * * * on which or whom he or they shall suspect there is merchandise which is subject to duty, or shall have been introduced into the United States in any manner contrary to law, whether by the person in possession or charge, or by, in, or upon such vehicle or beast, *or otherwise* * * *.*" (Emphasis added.)

More importantly, I cannot by any means agree with the majority opinion's statement that "[w]e have treated the outer limits of authority delegated by the statute [19 U.S.C. § 482] *as available only in border searches.*" (Emphasis added.) It is true that a difference exists in the application of 19 U.S.C. § 482 between searches made without warrant at or near a border and those made elsewhere, but the difference lies only in the requirement of probable cause. Numerous interpretations of the statute show that *it is not limited to border searches.* In searches made at a border without a warrant, no probable cause is necessary. Searches elsewhere under 19 U.S.C. § 482 may be made without a warrant, but probable cause for the search must be shown. That is the only difference between the applicability of the statute at a border and elsewhere. See, for example, Romero v. United States, 318 F.2d 530 (5th Cir. 1963); United States v. Zimmerman, 326 F.2d 1 (7th Cir. 1963). On the facts, see United States v. Blum, 329 F.2d 49 (2d Cir. 1964).

Again, the majority's limitation of 19 U.S.C. § 482 to border searches strikes me as illogical. Such a contribution reads out of the statute such clearly expressed terms as the permission to Customs agents to "search any trunk or envelope, *wherever found,* in which he may have a reasonable cause to suspect there is merchandise which was imported contrary to law." (Emphasis added.)

Thus, unless we say, as a matter of law, the packages searched are not, and cannot be, considered "trunks or envelopes," [12] or, that this is not geographically a "border search," despite the statutory language "wherever found" and the cases cited in the above quotation, the majority opinion is, in my opinion, in error in failing to pass on the "precise meaning" of the statute, and in relying solely, and I submit, wrongly, on Boyd v. United States, 116 U.S. 616, 623, 6 S.Ct. 524, 29 L.Ed. 746 (1886).

I read the *Boyd* case to hold that a reversal was required because of the invalidity of a court order requiring Boyd to produce an invoice establishing the value of the plate glass seized by Customs officers, thus requiring the defendant in a criminal proceeding to testify against himself. The authority of the court order was the fifth section of the Act of June 22, 1874, and that section was found unconstitutional and void under Amendment V, and not under Amendment IV. The distinction between ordinary searches and Customs searches is emphasized in *Boyd,* supra, and in later cases.[13] This difference was specifically relied upon by the Supreme Court in the later case of Carroll v. United States, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925). At pages 149–151, 45 S.Ct. at pages 283–284, the Court, pointing out the inapplicability of the Fourth Amendment for reasons it found sufficient, said:

> "On reason and authority the true rule is that if the search and seizure without a warrant are made upon probable cause, that is, upon a belief, reasonably arising out of circumstances known to the seizing officer, that an automobile or other vehicle contains that which by law is subject to seizure and destruction, the search and seizure are valid. The Fourth Amendment is to be construed in the light of what was deemed an unreasonable search and seizure when it was adopted, and in a manner which will conserve public interests as well as the interests and rights of individual citizens.

> "In Boyd v. United States, 116 U.S. 616 [6 S.Ct. 524, 29 L.Ed. 746], as already said, the decision did not turn on whether a reasonable search might be made without a warrant; but for the purpose of showing the principle on which the Fourth Amendment proceeds, and to avoid any misapprehension of what was decided, the court, speaking through Mr. Justice Bradley, used language which is of particular significance and applicability here. It was there said (page 623 [6 S.Ct. 528]):

>> 'The search for and seizure of stolen or forfeited goods, or goods liable to duties and concealed to avoid the payment thereof, are totally different things from a search for and seizure of a man's private books and papers for the purpose of obtaining information therein contained, or of using them as evidence against him. The two things differ *toto coelo.* In the one case, the government is entitled to the possession of the property; in the other it is not. The seizure of stolen goods is authorized by the common law; and the seizure of goods forfeited for a breach of the revenue laws, or concealed to avoid the duties payable on them, has been authorized by English statutes for at least two centuries past; and the like seizures have been authorized by our own revenue acts from the commencement of the government. * * *'

> \* \* \* \* \* \*

> "Thus contemporaneously with the adoption of the Fourth Amendment we find in the First Congress, and in the following Second and Fourth Congresses, a difference made as to the necessi-

---

12. Other courts have found such cardboard packages of smuggled watches to be "trunks or envelopes" within the statute. United States v. Epstein, 240 F.Supp. 84, 85–86 (S.D.N.Y. 1965).

13. See discussion of *Boyd,* supra, in One 1958 Plymouth Sedan v. Com. of Pennsylvania, 380 U.S. 693, 696, 85 S.Ct. 1246, 14 L.Ed.2d 170 (1965).

ty for a search warrant between goods subject to forfeiture, when concealed in a dwelling house or similar place, and like goods in course of transportation and concealed in a movable vessel where they readily could be put out of reach of a search warrant. Compare Hester v. United States, 265 U.S. 57, 44 S.Ct. 445, 68 L.Ed. 898."

As Judge Rives of the Fifth Circuit has well expressed it in Marsh v. United States, 344 F.2d 317, 324 (5th Cir. 1965):

"The right of border search is indeed broad, and the border itself is elastic. Judged by Texas standards sixty-three miles is a small distance, and if the Customs agents had any reason, even though not ordinarily measuring up to 'probable cause,' it might, under all of the circumstances, suffice to meet the constitutional test of reasonableness and amount to 'probable cause.'"

### IV

Paragraph "3" of Part II of the majority opinion holds this was not a private search conducted by an employee of Trans World Air Lines, pursuant to a right of inspection reserved in the contract of carriage. I disagree.

The package was opened by the T.W.A. employee, alone, using a knife. After it was opened, the Customs officers "held open the cardboard flaps," inspected the contents and marked the smaller boxes containing the smuggled watches for identification.

I fail to see anything illegal in the Customs officers asking the T.W.A. employee if he had authority to open the package; and if the T.W.A. employee did have such authority, in requesting him to do so.[14] I think the Customs officers would have been negligent in their duties had they failed to ask the T.W.A. employee to perform an act he was contractually authorized to do.

In following such a procedure, the Customs officers followed the best tradition of government service. They did not rely on the scintillator tests made on the run to the airport, nor on the additional facts hereinabove mentioned revealed to them at the airport, nor did they wait until the smuggled goods had been physically placed on the plane. They permitted the employee to examine the air line's contract with "Futterman," and to telephone his superior officer for legal clearance and permission. There was no force. There was no coercion. This certainly is not the usual case of a "federal search," where state and federal law enforcement officers combine in a search unlawful under federal law, and then claim it was the state officers who searched, not the federal officers. I cannot agree the request made by a law enforcement officer to a private citizen asking him to exercise his contractual right to aid in the ascertainment of criminal conduct, or to locate contraband, renders a lawful search an unlawful search.

Particularly I cannot reconcile myself to do it by stating, as does the majority opinion:

"The search was in substance a federal search, cast in the form of a carrier inspection to enable the officers to avoid the requirements of the Fourth Amendment."

This is no more an avoidance of the requirements of the Fourth Amendment than would be a simple request by any peace officer to a householder—"Will you open your door and permit us to search your home?"

I do not differ with the cases cited in the majority opinion on this point; I differ completely upon their applicability to the facts of this case.

In refusing to follow United States v. Blum, 329 F.2d 49 (2d Cir. 1964), some dust is thrown by the majority opinion in stating the facts of *Blum* "are

14. T.W.A. had previously opened packages under the terms of its waybill. (R.T. pp. 323; 353.) In New York, the T.W.A. employees opened the packages under the assumed authority of the waybill.

not clear." Those facts appear in the opinion as follows:

"Railway Express Air Division, in San Diego, California, close to the Mexican border, received from a 'Mexican fellow' a carton for shipment to appellant, a New York watch dealer, at appellant's home address in Brooklyn, New York. R.E.A. notified a Customs Agent, and the next day, when the same person brought in another carton, with the same consignor and consignee indicated, the carton when examined by an electronic device appeared to contain radioactive material. Thereafter, a Customs Agent at Idlewild Airport located and examined the first carton, which examination also indicated the presence of radioactive material. With permission of R.E.A., the package was opened and found to contain 2,149 Swiss watch movements without any importer's symbol. The movements were replaced in the package, the package resealed, and a search warrant obtained. With the assistance of R.E.A., a Customs Agent was clothed and equipped as an R.E.A. employee and made the delivery of both packages. Half an hour later, dressed in civilian clothes, the agent returned to Blum's premises, identified himself and asked for the packages. The appellant told the agent the whereabouts of the packages, in a utility room of Blum's house and the agent took the packages and arrested Blum. Blum when questioned about the cartons said they might be cutlery (one was mislabeled cutlery). When asked to open them, he refused, stating that they might be watches. Blum's explanation of their receipt was that one Sluis, the named consignor, whom he had met twice (and never saw again) had asked him to allow packages to be sent to his house for Sluis as a favor." 329 F.2d at 50.

On the issue of whether the R.E.A. had the right, solely by reason of its waybill, to open the packages, the second circuit had no doubt.

"We find no merit in the claim of unreasonable search and seizure. R. E. A. had a right to open the carton and examine the contents, which were misdeclared on the waybill. The electronic devices had indicated that the contents were other than the declared cutlery, justifying inspection under the right reserved in R. E. A.'s Express Classification." 329 F.2d at 52.

In *Blum,* supra, the waybill was R.E.A.'s; here T.W.A.'s. There the misclassification was "cutlery;" here it was "office equipment." In both instances the contents were "Swiss watch movements without any importer's symbol." In both cases scintillator tests were positive.

The majority opinion states (and I believe incorrectly) that the *Blum* opinion "suggests" that the carrier itself opened the carton and examined the contents for its own purposes; i. e., "the purposes contemplated by its reservation of a right of inspection. 329 F.2d at 52."

The *Blum* opinion merely says on page 52 that "R.E.A. had the right to open the carton, and examine the contents." On page 50 it states that the Customs officer "located" the package, found it contained "radioactive material," and "[w]ith permission of R.E.A., the package was opened [etc.]".

Thus there was far less evidence to justify the opening in *Blum* than here exists. There the *only* evidence was of radioactive material, and the opening— "with permission" of the carrier—was sufficient to justify inspection, and the court found "no merit" in the claimed unreasonableness of the search and seizure.

Furthermore, other courts with lesser factual reasons have passed on the same issue and reached a result contrary to that of the majority opinion.

In Romero v. United States, 318 F.2d 530 (5th Cir. 1963), a locked trunk, a locked suitcase, and two separate parcels were opened *by the Customs agents* (who

found marijuana) after delivery to the Southern Pacific Railway for shipment as baggage. This was done on the strong odor of marijuana *alone*. No evidence of a recent border crossing existed. No warrant was obtained. There the train was not to leave for two and one-half hours. *Probable cause was found for the search without a warrant, and, as well, authority under 19 U.S.C. § 482 to search and seize* the contraband. The Supreme Court unanimously denied *certiorari* in this case. 375 U.S. 946, 84 S. Ct. 357, 11 L.Ed.2d 277 (1963). Cf. also: United States v. One 1937 Hudson Terraplane Coupe, 21 F.Supp. 600 (W.D. Ky.1937), and United States v. Epstein, 240 F.Supp. 84 (S.D.N.Y.1965), involving smuggled watches. The decision in the latter case rests upon the statutory authority given by 19 U.S.C. § 482 to Customs agents to open a package then in custody of an employee of Valiant Watch, Ltd. Based on what was discovered, the government obtained a search warrant. On the companion motion to suppress, an eminent judge— District Court Judge Weinfeld—held the same statute authorized the Customs agents to examine the packages and secure samples of the contraband watches therefrom "with or without the consent of the employee" of the corporation having possession thereof.

> "They did not act upon **mere** suspicion, but on each occasion had abundant evidence upon which to ground a reasonable relief (sic) that the packages contained illegally imported watch movements. Defendants' contention that authority to search without a warrant is confined under the statute to customs borders and ports of entry, or situations involving hot pursuit, finds no support in the cases and files in the face of the plain statutory language permitting a search on reasonable cause of 'any trunk or envelope, wherever found.' The defendants overlook the fact, of which the Court takes notice, that the searches in question occurred in New York City, the largest of our ports of entry.

Moreover, assuming that petitioner interprets the statute correctly, the events and circumstances which led to the inspection survive any constitutional claim of unreasonable search. Since the packages were in transit, it was not feasible to obtain a search warrant; any purpose of inspection of the suspected contraband would have been frustrated by the time a warrant could have been obtained." 240 F.Supp. at 85–86.

## V

In paragraph "4" of Part II, the majority opinion deals with irrelevant issues not raised on appeal, thus setting up red herring to be easily hooked. These include the issues of abandonment, appellant's standing to assert the invalidity of the search, and the theory of a joint right of access to the place of search.

The majority opinion then states: "[M]ere surrender of custody to a carrier did not forfeit appellant's right to privacy." Citations in support of this position are but three cases: Ex Parte Jackson, 96 U.S. 727, 732, 24 L.Ed. 877 (1878); Santana v. United States, 329 F.2d 854, 856 (1st Cir. 1964); Oliver v. United States, 239 F.2d 818, 820–821, 61 A.L.R.2d 1273 (8th Cir. 1957). Each of these cases relates solely to the use of the United States mails. They hold that first class letters, and "sealed packages subject to letter postage" may not be opened. At the times that each of these cases was decided, statutes existed which barred the opening by postal authorities of letters or packages on which "letter postage" or "first class" postage had been paid, and these cases did no more than follow the restrictions of the statute in effect at the time. The current statutory bar is 39 U.S.C. § 4057 which states:

> " § 4057. *Opening first class mail*
>
> Only an employee opening dead mail by authority of the Postmaster General, or a person holding a search warrant authorized by law may open any letter or parcel of the first class which is in the custody of the Department."

First class or "letter postage" mail is the only mail so protected from inspection under current regulations made pursuant to 39 U.S.C. § 501, for, as noted in Santana v. United States, supra, 329 F.2d at 856 "Postal Manual Regulation 311.11 provides: 'Mail other than first class mail may be opened for postal inspection, except official mail weighing more than four pounds.'" The statute existing at the time of the *Jackson* opinion, supra, as noted in Oliver v. United States, supra, 239 F.2d at 822, specifically authorized the inspection of all "mail matter not charged with letter postage," and was contained in 39 U.S.C. § 251. In *Santana,* supra, the "air parcel post" package containing lottery tickets was held *not* to be first class postage, and hence the opening and examination of contents by the superintendent of mails was held by the district court *not* to be an illegal search and seizure, and this judgment was affirmed on appeal. In *Oliver,* supra, the heroin *was* mailed first class, and was held not subject to inspection.

Not one of these cases supports the statement that "surrender of custody to a carrier did not forfeit appellant's right to privacy." It did, if appellant waived his right to privacy by entering into a contract of carriage which authorized the opening of the package by the carrier. It is upon such reasoning and authority that the majority propose to overrule Marshall v. United States, 352 F.2d 1013 (9th Cir. 1965).

Can any of the majority think seriously that Sartain (the owner of the heroin placed in his briefcase), in Sartain v. United States, 303 F.2d 859 (9th Cir. 1962), "impliedly authorized" his friend Zucher to deliver the brief case to Berman so that Berman "could call the police"? To me the proposition is absurd. Yet the majority opinion approves *Sartain,* supra, as well as United States v. Eldridge, 302 F.2d 463 (4th Cir. 1962) on the theory of "implied consent" to an invasion of appellant's right of privacy.

In *Eldridge,* supra, the search of the car was without consent, without a warrant, and not incident to lawful arrest. There the court said:

"On the merits of the constitutional issue we agree with the result reached by the District Court. Not every search made without a warrant is illegal. The Fourth Amendment prohibits only 'unreasonable' searches and seizures. Such decisions as have been cited to us or discovered by research have only a peripheral bearing on the question to be decided in this case. Lower federal courts have deemed searches reasonable if consented to by the person in lawful possession of the articles seized, or the premises on which they are found, * * *. [citing examples].

\* \* \* \* \* \*

"The appellant mistakenly contends that the recent case of Chapman v. United States, 365 U.S. 610, 81 S.Ct. 776, 5 L.Ed.2d 828 (1961), supports him. That case is not analogous to this, for here consent was given by the bailee in actual lawful possession of the car, and it is the bailor who claims that his constitutional rights were violated by the search. If Chapman sheds any light whatever on the question that concerns us here, it is possibly in the indication it gives that authorization of the search may come from a person in actual lawful possession, and that his rights may not be waived by an owner who has the right to reclaim possession, but has not done so." 302 F.2d at 465.

Here the Trans World Air Lines was in actual lawful possession.

Both *Sartain,* supra, and *Eldridge,* supra, sustain my position on this appeal. The three mail cases cited above do not in any way vitiate the holdings in *Sartain* and *Eldridge,* either specifically or by inference.

### VI

The majority opinion then states in Part III that "all or substantially all of the evidence implicating appellant was secured by the government through exploitation of the information obtained

by the illegal search of appellant's package." This is simply not so, in my opinion. I think the fact recital in the majority opinion, together with the additional facts cited in this opinion, and an examination of all the evidence introduced, refutes and disproves the accuracy of such a general statement.

I would unhesitatingly affirm the judgment of conviction appealed from, and I dissent.

CHAMBERS, Circuit Judge, concurs in the dissent of Judge BARNES.

DUNIWAY, Circuit Judge (dissenting):

Like my Brother BARNES, I concur in Part I of the majority opinion. I also agree with Part IV of the opinion of Judge BARNES. I think that when the parcels were left with the airline under an agreement which empowered the airline to open them, appellant surrendered his right of privacy as to those parcels, and that it was perfectly proper for government agents to ask airline employees to exercise their authority in aid of the government's law enforcement activities. I would affirm.